PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3738
_____

MARIO HENRY, as administrator of the estate of
Gwyneth E. Henry and as guardian of S.H., a minor;
ALYSHIA M. RICHARDSON, as administratrix of the estate
of Tyreesha L. Richardson and as guardian of D.R., a minor

v.

CITY OF ERIE; THE HOUSING AUTHORITY OF THE
CITY OF ERIE; JOHN E. HORAN; JOSEPH ANGELOTTI;
BRETT C. HAMMEL; PATRICIA A. HAMMEL

John E. Horan and Joseph Angelotti,
                                    Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil Action No. 1-10-cv-00260
(Honorable Maurice B. Cohill, Jr.)
_____

Argued: September 10, 2012

Before: SCIRICA, ROTH, and BARRY, *Circuit Judges*.

(Filed: August 23, 2013)

Joseph M. Kanfer, Esq. (ARGUED)
John F. Mizner, Esq.
Mizner Law Firm
201 German Street
Erie, PA 16507
        *Counsel for Appellees*

Richard A. Lanzillo, I, Esq. (ARGUED)
Knox, McLaughlin, Gornall & Sennett
120 West Tenth Street
Erie, PA 16501

        *Counsel for Appellants*

_____

OPINION OF THE COURT

_____

SCIRICA, *Circuit Judge*.

In this appeal from a motion to dismiss plaintiffs' § 1983 claim, we must determine whether state officials' approval and subsidization of an apartment for the Section 8 housing program, even though the apartment allegedly failed to comply with Section 8's Housing Quality Standards, constitutes a state-created danger toward the apartment's tenant and her guest in violation of their substantive due process rights under the United States Constitution.

Accepting plaintiffs' plausible factual allegations as true for the purpose of this appeal, we do not find that plaintiffs have adequately pled a state-created danger claim. Accordingly, we will reverse the judgment of the District Court.[1]

## I.

On July 25, 2010, a fire at an apartment located at 933 West 18th Street in Erie, Pennsylvania took the lives of tenant Tyreesha L. Richardson and her guest Gwyneth E. Henry. Their bodies were found on the third floor of the apartment, and an autopsy confirmed both women died from smoke inhalation. The third-floor bedroom purportedly lacked a smoke detector and an alternate means of egress—even though the apartment was required to have both safety features under the Section 8 housing choice voucher program in which Richardson participated.

Plaintiff Alyshia M. Richardson is the administratrix of the estate of Tyreesha L. Richardson, and Plaintiff Mario Henry is the administrator of the estate of Gwyneth E. Henry.

## A.

Section 8 of the United States Housing Act of 1937, 42

---

[1] All references to the District Court refer to its memorandum order, *Henry v. City of Erie*, No. 10-260, 2011 U.S. Dist. LEXIS 110562 (W.D. Pa. Sept. 28, 2011), and to the Report and Recommendation of Magistrate Judge Baxter, dated August 19, 2011, which was adopted as the opinion of the District Court. *Id.* at *5.

U.S.C. § 1437f, established a housing program to help eligible low-income families afford safe and sanitary housing. The United States Department of Housing and Urban Development ("HUD") oversees the program, which is administered by local agencies in accordance with federal guidelines. In Erie, the local administering agency is the Housing Authority of the City of Erie ("HACE"). Defendant John E. Horan is the Executive Director of HACE, where he is responsible for ensuring HACE complies with applicable laws and regulations as well as overseeing its employees. Defendant Joseph Angelotti is employed by HACE as a Section 8 Housing Inspector.

HACE provides housing vouchers to families it determines qualify for tenant-based assistance. A qualifying family may take the voucher to a willing landlord of its choosing, subject to HACE's approval of the tenancy. HACE approval requires an inspection and a determination that the dwelling unit meets the Housing Quality Standards ("HQS") promulgated by HUD. Among other things, the Housing Quality Standards require that the dwelling unit have "an alternate means of exit in case of fire (such as fire stairs or egress through windows)," 24 C.F.R. § 982.401(k), and "at least one battery-operated or hard-wired smoke detector, in proper operating condition, on each level," *Id.* § 982.401(n).

If HACE approves a tenancy after inspection, HACE and the property owner will enter into a Housing Assistance Payment ("HAP") contract in which HACE agrees to pay a certain portion of the tenant's monthly rent. The tenant enters into a lease with the property owner and is responsible for paying the remainder of the agreed-upon rent. The property owner must keep the unit in compliance with the Housing

4

Quality Standards for the duration of the lease. HACE employs housing inspectors to inspect units prior to leasing, annually thereafter, and "at other times as needed" to ensure compliance. *Id.* § 982.405(a). HACE's Administrative Plan provides:

> 1. The owner must maintain the assisted unit in accordance with HQS.
>
> 2. The HACE will take prompt action to enforce the owner's obligations for owner breach of the HQS.
>
> 3. The HACE will notify the owner and tenant of HQS deficiencies for which the owner is responsible. The notice will provide for the following:
>
>   - For HQS failures, the owner will be given up to thirty (30) days to correct the item(s). The HACE Executive Director or designee may, at his/her discretion, approve a reasonable extension of time depending upon the extent or scope of work required.
>
>   - If the defect is life threatening to the family's health or safety, the owner will be given 24 hours to correct the violation.
>
>   - If the owner fails to correct failed items, the payment will be suspended or the

HAP Contract will be terminated.

4. The HACE will not make any assistance payments for a dwelling unit in which HQS deficiencies have not been corrected after the notice period has expired.

5. If "life threatening" deficiencies are not corrected within 24 hours, the owner will be given notice of intent to terminate the HAP Contract and that the Housing Assistance Payment will be suspended through the Termination Notice period.

Compl. ¶ 63 (citing Housing Authority of the City of Erie, Section 8 Housing Choice Voucher Administrative Plan, 6-3 to 6-4 (2003)).[2]

### B.

Richardson was a tenant participant in the Section 8 housing program. With her voucher, Richardson rented a unit on the second and third floors of an apartment duplex owned by Brett and Patricia Hammel.

According to the complaint, on March 27, 2006,

---

[2] Similarly, 24 C.F.R. § 982.404(a)(2) requires HACE to "take prompt and vigorous action to enforce the owner obligations" in response to an owner's failure to comply with the Housing Quality Standards, with remedies including "termination, suspension or reduction of housing assistance payments and termination of the HAP contract."

6

Angelotti performed the initial inspection required to approve the apartment for the program. He failed the apartment at that time and informed the owners the following repairs were necessary to make it suitable for the Section 8 program:

> In the third floor bedroom:
> a. Install a smoke detector.
> b. Secure the railing.
> c. A fire escape ladder must be in place for a second means of egress.

*Id.* ¶ 68.

On April 25, 2006, Angelotti purportedly allowed the apartment to pass inspection, even though it still lacked a third-floor fire escape ladder. We will also assume the apartment lacked a third-floor smoke detector, although the complaint is inconsistent regarding such allegations.[3]

Angelotti then purportedly allowed the apartment to pass annual inspections in 2007, 2009, and 2010. Plaintiffs assert Angelotti inspected the apartment on March 24th and March 31st of 2009. A HACE Inspection Checklist lists various categories for inspection. On the 2009 Checklist, next

---

[3] At one point in the complaint, plaintiffs state that at the time of the fire, "upon information and belief, the third floor bedroom failed to have a smoke detector." *Id.* ¶ 17. But at another point, plaintiffs assert that "[w]hether a smoke detector was installed or whether the railing was secured in March or April of 2006 is unknown." *Id.* ¶ 69. We assume the apartment did not have a third-floor smoke detector because it does not affect our analysis.

to the "smoke detectors" category, an "x" has been marked under the column stating "No," and the words "Install in bedroom" have been written in. *Id.* ¶ 72. In 2010, the apartment was inspected once. The 2010 Checklist has the same "No" indication next to the "smoke detectors" category, along with a handwritten annotation:

> Install as need
> replace batteries.

*Id.* ¶ 74.

The results of the 2008 annual inspection are unknown, but on April 29, 2008, Kimberly A. Preston, HACE's Section 8 Program Coordinator, sent a letter to Richardson stating:

> Please be advised that the Housing Authority of the City of Erie will terminate all housing assistance payments and the Section 8 contract on your behalf effective May 31, 2008.
>
> This action will be taken because your housing unit was not brought up to the required Housing Quality Standards. Please refer to our inspection report dated April 29, 2008 (however, if the work has been completed, please contact the office and schedule a re-inspection).

*Id.* ¶ 71. Preston sent similar letters to Richardson after the 2009 and 2010 inspections. The 2009 letter warned that housing assistance payments would terminate effective May 31, 2009 due to the inspection report dated March 31, 2009,

unless the apartment was brought into compliance with the Housing Quality Standards. The 2010 letter warned that housing assistance payments would terminate effective May 31, 2010 due to the inspection report dated April 8, 2010, unless the apartment was brought into compliance with the Housing Quality Standards. Despite these warning letters and the owners' continued failure to comply with the Housing Quality Standards, HACE did not terminate the housing assistance payments for Richardson's apartment. As noted, on July 25, 2010, the apartment succumbed to fire,[4] and Richardson and Henry died in the third-floor bedroom.

C.

Plaintiffs brought suit on behalf of decedents Richardson and Henry, asserting the following: (1) an equal protection claim against the City of Erie; (2) a § 1983 claim against HACE, Horan, and Angelotti for violating the Housing Act; (3) a § 1983 claim against HACE, Horan, and Angelotti under the state-created danger theory; and (4) a negligence claim against the Hammels, the apartment's owners.

The District Court referred the matter to a Magistrate Judge and adopted *in toto* the Report and Recommendation of the Magistrate Judge. The court dismissed plaintiffs' equal protection claim and Housing Act claim. But the court found plaintiffs adequately pled a state-created danger claim by asserting that but for defendants' affirmative acts in approving and subsidizing the apartment, Richardson would not have been living in that apartment, and she and Henry

---

[4] The complaint does not identify the cause of the fire.

would not have been killed in the fire. The court stated Richardson's and Henry's deaths were a foreseeable result of defendants' acts, and found Richardson and Henry were part of a discrete class of persons—occupants of the third-floor bedroom—subjected to harm. The court also concluded a jury could find defendants' behavior was deliberately indifferent and conscience-shocking.

The court rejected Horan and Angelotti's qualified immunity defense, explaining that because the state-created danger doctrine was well-established since July 1999, and defendants deliberately disregarded a known violation of Section 8, they could not have believed their conduct comported with the law. The court found a reasonable official would have understood that approving the apartment for the Section 8 program despite its noncompliance with the Housing Quality Standards would violate decedents' substantive due process rights.

Horan and Angelotti appeal the District Court's order denying them qualified immunity on plaintiffs' state-created danger claim. Meanwhile, plaintiffs' negligence claim against the Hammels and state-created danger claim against HACE remain pending in the District Court.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291 because an order denying a public official's motion to dismiss that is based on qualified immunity and turns on a question of law is immediately appealable as a "final decision" under the *Cohen* collateral order doctrine. *Ashcroft v. Iqbal*, 556 U.S. 662, 672

10

(2009) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)).

"We exercise de novo review of a district court's denial of a motion to dismiss on qualified immunity grounds as it involves a pure question of law." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012). To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

### III.

Plaintiffs brought suit under 42 U.S.C. § 1983. "Under Section 1983, a plaintiff must plead a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether defendants are entitled to qualified immunity, we must ask "whether 'the facts alleged show the officer's conduct violated a constitutional right,'"

and "'whether the right was clearly established.'" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Courts of Appeals may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. In this case, we find the complaint, taken in the light most favorable to plaintiffs, fails to "'show the [officials'] conduct violated a constitutional right.'" *Walter v. Pike Cnty.*, 544 F.3d 182, 191 (3d Cir. 2008) (quoting *Saucier*, 533 U.S. at 201). Therefore, plaintiffs' claim should have been dismissed.

IV.

Federal appellate courts that have addressed the issue have held that the Housing Act does not create a private right to housing of a particular condition or a private cause of action to enforce any such right.[5] *See Banks v. Dallas Hous. Auth.*, 271 F.3d 605, 610-11 (5th Cir. 2001); *Perry v. Hous.*

---

[5] Several district courts have also held that an individual may not maintain a private cause of action for allegedly unsafe housing conditions under Section 8 of the Housing Act. *See, e.g.*, *Reynolds v. PBG Enters., LLC*, Civ. A. No. 10-4373, 2011 WL 2678589, at *8-9 (E.D. Pa. July 6, 2011) (no express federal rights created or private cause of action implied under § 1437f); *Montgomery v. City of New York*, No. 09 Civ. 6145(RJH), 2010 WL 3563069, at *3-4 (S.D.N.Y. Sept. 7, 2010) (same); *Kirby v. Richmond Redev. & Hous. Auth.*, No. 3:04cv791, 2005 WL 5864797, at *8 (E.D. Va. Sept. 28, 2005) (same), *aff'd*, 194 F. App'x 105 (4th Cir. 2006).

*Auth. of Charleston*, 664 F.2d 1210, 1217 (4th Cir. 1981). The statute itself is silent on the issue of a private cause of action. *See* 42 U.S.C. § 1437f. But the implementing regulations specify that no rights are conferred on tenants to sue for violations of the Housing Quality Standards. *See* 24 C.F.R. § 982.406 (stating the Housing Choice Voucher Program "does not create any right of the family, or any party other than HUD or the PHA [Public Housing Agency], to require enforcement of the HQS requirements by HUD or the PHA, or to assert any claim against HUD or the PHA, for damages, injunction or other relief, for alleged failure to enforce the HQS").

In accordance with this case law, plaintiffs do not bring suit under § 1983 for violations of Section 8 or its accompanying regulations. Rather, plaintiffs contend that defendants, acting under color of state law, deprived decedents of their "right[s] to life, liberty and bodily integrity under the Fourteenth Amendment to the Constitution." *Phillips*, 515 F.3d at 235. Although the Supreme Court has made clear that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989), we have recognized that a state actor may be held liable under the "state-created danger" doctrine for creating a danger to an individual in certain circumstances. *See Morrow v. Balaski*, No.11-2000, 2013 WL 2466892, at *13 (3d Cir. June 5, 2013) (en banc).

The state-created danger doctrine derives from the Supreme Court's decision in *DeShaney*. In that case, four-year-old Joshua DeShaney was repeatedly beaten by his

13

father. 489 U.S. at 192-93. Although the Winnebago County Department of Social Services ("DSS") obtained a court order to place Joshua in the temporary custody of a local hospital, it returned him to his father's custody after deciding there was insufficient evidence of abuse. *Id.* at 192. DSS continued to check on Joshua, but despite signs of abuse, failed to take any action to protect him. *Id.* at 192-93. The beatings from his father eventually caused Joshua to suffer severe brain damage. *Id.* at 193.

Joshua and his mother brought suit against DSS and several of its employees under § 1983, alleging that by failing to protect Joshua against a risk of which they knew or should have known, defendants violated Joshua's rights under the Fourteenth Amendment. *Id.* The Court rejected Joshua's claim, stating, "[a]s a general matter, . . . we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The Court acknowledged that in limited contexts, such as "incarceration, institutionalization, or other similar restraint of personal liberty," a "special relationship" between the state and the individual imposes on the state an affirmative duty to protect, but found that such a relationship did not exist between Joshua and the state because the harm to Joshua occurred while he was in his father's custody. *Id.* at 200-03.

Moreover, in finding the state and its employees could not be held liable on the facts of the case, the Court explained the state had not, by its actions, placed Joshua in a more dangerous position:

While the State may have been aware of the

14

dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.* at 201. Among several circuits, including our own, this language generated a "complement to the *DeShaney* holding [that] has come to be known . . . as the 'state-created danger doctrine.'" *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006). To establish a state-created danger claim, plaintiffs must plead four elements:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

15

> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Morrow*, 2013 WL 2466892, at *13-14 (quoting *Bright*, 443 F.3d at 281). In this case, we needn't look further than the first element of the state-created danger claim. Because the harm caused was not a "fairly direct" result of defendants' actions, plaintiffs have not adequately pled a state-created danger claim.

The first step of the state-created danger analysis requires the harm to be a "foreseeable and fairly direct" consequence of defendants' actions. "To adequately plead foreseeability . . . , we require a plaintiff to allege . . . an awareness of risk that is sufficiently concrete to put the [state] actors on notice of the harm." *Phillips*, 515 F.3d at 238. We think the harm that occurred here was likely foreseeable. By establishing basic safety requirements for Section 8 housing, the Housing Quality Standards are intended to guard against foreseeable hazards. The risk created by housing a tenant in an apartment without a third-floor smoke detector or fire escape is clear—that, in the event of a fire, persons on the third floor might become trapped and harmed thereby. Several cases have so held based on claims of negligence.[6]

---

[6] *See, e.g.*, *Fed. Ins. Co. ex rel. Singer v. ADT Sec. Sys., Inc.*, 222 F.R.D. 578, 581 (N.D. Ill. 2004) ("'[T]he danger of fire is foreseeable in virtually any context . . . .'" (quoting *Bartelli v. O'Brien*, 718 N.E.2d 344, 349 (Ill. App. Ct. 1999))); *Dillard v. Pittway Corp.*, 719 So. 2d 188, 192 (Ala. 1998)

16

But foreseeability does not end the analysis. Most cases involving failure to comply with health and safety standards will meet the hurdle of foreseeability. More significant and relevant here is the requirement that defendants' actions be a "fairly direct" cause of decedents' harm.

State actors are not liable every time their actions set into motion a chain of events that result in harm. The Supreme Court has explained, for instance, that

> [a] legislative decision that has an incremental impact on the probability that death will result in any given situation—such as setting the speed limit at 55-miles-per-hour instead of 45—cannot be characterized as state action depriving a person of life just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander.

*Martinez v. State of California*, 444 U.S. 277, 281 (1980).

*Martinez* arose from the murder of a teenage girl by a parolee. *Id.* at 279. The girl's parents brought suit, contending

---

("Certainly, it is foreseeable that a person could be hurt if a smoke detector fails to give notice for all to exit the house . . . ."); *Doyle v. S. Pittsburgh Water Co.*, 199 A.2d 875, 879 (Pa. 1964) ("Could the needs of domiciliary life require anything more vitally than proper fire protection?"); *Thornton v. Phila. Hous. Auth.*, 4 A.3d 1143, 1152 (Pa. Commw. Ct. 2010) ("The purpose of the smoke/fire detection system was to provide an early warning of fire and to prevent and reduce damages and resulting injuries.").

state officials responsible for releasing the parolee should be held liable for the ensuing harm. *Id.* The parents claimed state officials were aware that the parolee had been committed to a mental hospital as a sex offender not amenable to treatment and imprisoned with the recommendation that he not be paroled, but that these officials nonetheless decided to parole him five years into his incarceration. *Id.* The parolee committed the murder five months after his release. *Id.* at 279-80. The Court assumed that state officials knew or should have known that such an incident would occur. *Id.* at 280. Nonetheless, it held that "at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law." *Id.* at 285. The Court explained that regardless of whether the parole board could be said to have "proximately" caused the decedent's death as a matter of state tort law, the parole board did not deprive the decedent of life within the meaning of the Fourteenth Amendment. *Id.* The Court concluded that "[a]lthough a § 1983 claim has been described as 'a species of tort liability,' it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." *Id.* (citation omitted) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)).

*Martinez* made clear that even if state officials take action with the requisite culpability, the scope of consequences for which they may be held liable is circumscribed. At some point, regardless of what state tort law may provide, the harm that follows from state officials' actions becomes too remote to support liability under § 1983. Although *Martinez* did not lay down a rubric for measuring remoteness, we have addressed this issue with some

specificity in the state-created danger context.

In *Morse v. Lower Merion School District*, we found plaintiffs failed to adequately plead the "foreseeable and fairly direct" element of a state-created danger claim. 132 F.3d 902, 904 (3d Cir. 1997). School officials in *Morse* had allegedly left the back entrance to the school unlocked, in violation of school policy, to allow various contractors to come and go easily. *Id.* Through this unlocked back door, a mentally ill person entered the school grounds and shot and killed teacher Diane Morse. *Id.* Morse's family brought suit against the school district, alleging that officials' actions in leaving the back door unlocked deprived Morse of her right under the Fourteenth Amendment to be free from physical harm. *Id.* We affirmed the District Court's dismissal of the claim. *Id.* In addition to holding that the murder was unforeseeable, we held the attack "was not a 'fairly direct' result of defendants' actions." *Id.* at 908. We explained,

> [w]hile we must accept the allegation that [the attacker] gained access to the building through the unlocked rear entrance, this does not mean the attack on Diane Morse occurred as a direct result of defendants allowing the construction crews to prop open the door. The causation, if any, is too attenuated.

*Id.* at 909. In short, "it was not defendants' decision to allow the rear entrance to the school to remain open that precipitated or was the catalyst for the attack on Ms. Morse. . . . [A]s a matter of law, . . . their actions [cannot] be said to have directly caused the attack." *Id.* at 910.

Also instructive on the issue of causation is a case considered by the United States Court of Appeals for the Tenth Circuit. *See Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002). In *Ruiz*, a young boy was fatally injured by the operator of his daycare facility. *Id.* at 1178. After the boy's death, his mother brought suit against state licensing officials, alleging the officials improperly licensed the daycare facility even though they knew or should have known that the operator had a history of domestic violence and that the facility did not carry proper insurance. *Id.* Applying a state-created danger test that requires a plaintiff to allege that "the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm," the Tenth Circuit held the plaintiff had not adequately pled a state-created danger claim. *Id.* at 1183. The court explained that "[a]ffirmative conduct for purposes of § 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration." *Id.* The plaintiff's claim failed because, among other things, "improper licensure did not impose an immediate threat of harm," but instead an unactionable "threat of an indefinite range and duration." *Id.*

Although our articulation of the elements of a state-created danger claim differs somewhat from that expressed by the Tenth Circuit, we concur that improper licensure will often be too far removed from the ultimate harm to permit liability under § 1983. Our phrasing in *Morse* supports this view. To fulfill the "fairly direct" requirement of the state-created danger claim, the plaintiff must plausibly allege that state officials' actions "precipitated or w[ere] the catalyst for" the harm for which the plaintiff brings suit. *Morse*, 132 F.3d at 910. "Precipitate," in turn, means "to cause to happen or

come to a crisis suddenly, unexpectedly, or too soon." *Webster's Third New International Dictionary* 1784 (1993); *see also The Random House Dictionary of the English Language* 1521 (2d ed. 1987) (defining "precipitate" as "to hasten the occurrence of; bring about prematurely, hastily, or suddenly"); *id.* at 325 (defining "catalyst" as "a person or thing that precipitates an event or change"). Thus, it is insufficient to plead that state officials' actions took place somewhere along the causal chain that ultimately led to the plaintiff's harm.

Plaintiffs have not plausibly alleged that defendants' actions were close in time and succession to the ultimate harm. In other words, defendants' approval and subsidization of the apartment did not lead "fairly directly" to the fire that claimed the lives of Richardson and Henry. Defendants' actions were separated from the ultimate harm by a lengthy period of time and intervening forces and actions.

Although the cause of the fire is not known at this stage of the litigation, plaintiffs do not allege that defendants caused the fire or increased the apartment's susceptibility to fire. Nor do plaintiffs contend that defendants failed to install a smoke detector and a fire escape on the third floor of Richardson's apartment. Plaintiffs' allegations against defendants are a step further removed: plaintiffs contend that defendants should have compelled or induced the landlord/owners to install a fire escape and smoke detector (or induced Richardson to live elsewhere), either by not approving the apartment for the Section 8 housing program and/or by terminating the subsidy payments that allowed Richardson to continue to live there.

Unfortunately for plaintiffs, their reasoning proves too much. Plaintiffs' complaint makes clear it was the owners' responsibility—not defendants'—to install a smoke detector and fire escape. The regulations cited by plaintiffs confirm the owner is required to maintain the unit in accordance with the Housing Quality Standards. *See* Compl. ¶ 42 (citing 24 C.F.R. 982.404(a)). Assuming, as we must, that a smoke detector and fire escape could have prevented decedents' deaths, the responsibility (and capability) to install these safety features did not rest with defendants.[7]

Further attenuating the connection between defendants' actions and the ultimate harm is the fact that Richardson remained in the apartment and received rent subsidies despite having actual notice the apartment failed to meet the Housing Quality Standards. There was substantial time to reflect on the living situation before the fire took place. Defendants did not "'throw[] [her] into a snake pit,'" *Ye v. United States*, 484 F.3d 634, 637 (3d Cir. 2007) (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)), with all the urgency that such a situation would entail. According to the complaint, defendants warned Richardson that her apartment was not up to code. And plaintiffs do not allege that defendants did anything to hinder her or the landlord/owners from bringing it into compliance. As unfortunate as the circumstances may be, "[w]hen a victim bears some responsibility for the risks she has incurred, it is even more difficult to say that the 'state' has 'created' the

---

[7] We recognize that plaintiffs have a negligence claim pending against the landlord/owners in the District Court. We express no opinion on the merits of that action.

22

'danger' to her by its affirmative acts." *Jones v. Reynolds*, 438 F.3d 685, 694 (6th Cir. 2006).[8]

Under the circumstances, we cannot find that defendants created the danger faced by decedents—there were too many links in the causal chain after defendants acted and before tragedy struck.

V.

The Supreme Court has counseled a restrained approach in the area of substantive due process. The Court has said that "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," and cautioned that courts must "exercise the utmost care whenever . . . asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Heeding this advice, the *DeShaney* Court declined to expand its substantive due process jurisprudence even in the face of tragic circumstances, explaining that

> [t]he people . . . may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to

---

[8] By so holding, we do not mean to minimize the difficult situation faced by many participants in the Section 8 housing choice voucher program. We recognize that, practically speaking, Section 8 participants may face limited options for obtaining safe and sanitary housing. We merely emphasize that these limitations derive from the housing market and the participants' financial circumstances—not from the state's implementation of the housing voucher program.

23

act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

489 U.S. at 203. Again, in *County of Sacramento v. Lewis*, the Court said that substantive due process "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," 523 U.S. 833, 848 (1998), and found that in cases dealing with executive action, our role is to guard against "only the most egregious official conduct," *id.* at 846.

Under our state-created danger jurisprudence, we cannot find that defendants' failings amount to a state-created danger. We decline to expand the state-created danger doctrine—a narrow exception to the general rule that the state has no duty to protect its citizens from private harms—to embrace this case.[9] Accordingly, we will reverse the order of the District Court denying qualified immunity to Horan and Angelotti and remand for proceedings consistent with this opinion.

---

[9] We are not aware of a case in which a circuit court extended liability under the state-created danger doctrine to licensing-type activities. Nor have plaintiffs cited such a case.