**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| STANLEY CRAWFORD, TRACEY ANDERSON, DELIA CHATTERFIELD, AISHAH GEORGE, RITA GONSALVES, MARIA GONSALVES-PERKINS, WYNONA HARPER, TAMIKA MORALES, CHERYL PEDRO, ROSALIND PICHARDO, CEASEFIRE PENNSYLVANIA EDUCATION FUND, AND THE CITY OF PHILADELPHIA, | : : : : : : : : : : : | No. 19 EAP 2022<br><br>Appeal from the Order of Commonwealth Court entered on May 26, 2022 at No. 562 M.D. 2020.<br><br>ARGUED: September 13, 2023 |
| Appellants | : : : | |
| v. | : : : | |
| THE COMMONWEALTH OF PENNSYLVANIA, THE PENNSYLVANIA GENERAL ASSEMBLY, JOANNA MCCLINTON, IN HER OFFICIAL CAPACITY AS SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES, AND KIM WARD IN HER OFFICIAL CAPACITY AS PRESIDENT PRO TEMPORE OF THE PENNSYLVANIA SENATE, | : : : : : : : : : : : : : | |
| Appellees | : | |

**<u>OPINION</u>**

**JUSTICE BROBSON**                                    **DECIDED: November 20, 2024**

Gun violence is taking lives and destroying families in all parts of this Commonwealth. Appellants in this case do not believe that our state government has

done or is doing enough to curtail it.[1] They believe local governments should be permitted to pass and enforce certain local firearms ordinances that Appellants contend will address and reduce gun violence in their communities. Faced with what they believe to be an inadequate response at the state level, Appellants, in a Petition for Review (Petition) addressed to the Commonwealth Court's original jurisdiction, ask the judiciary to declare as unconstitutional or otherwise unlawful two statutory provisions that they contend hamper their ability to enact local legislation on the subject: (1) Section 6120 of the Pennsylvania Uniform Firearms Act of 1995 (UFA),[2] 18 Pa. C.S. § 6120, and (2) Section 2962(g) of the Home Rule Charter and Optional Plans Law (Home Rule Law),[3] 53 Pa. C.S. § 2962(g). These provisions, generally speaking, prohibit local governments from enacting or enforcing ordinances that regulate the ownership, transportation, possession, or transfer of firearms. Appellants refer to these provisions as firearms preemption laws or FPLs.

A divided en banc panel of the Commonwealth Court sustained preliminary objections and dismissed the Petition for failure to state claims upon which relief could be granted (demurrer). Appellants sought review of that decision by this Court. After careful consideration of the parties' arguments[4] and for the reasons that follow, we affirm the Commonwealth Court's order dismissing the Petition with prejudice.

---

[1] Appellants are Stanley Crawford, Tracey Anderson, Delia Chatterfield, Aishah George, Rita Gonsalves, Maria Gonsalves-Perkins, Wynona Harper, Tamika Morales, Cheryl Pedro, and Rosalind Pichardo (collectively, Citizens), Ceasefire Pennsylvania Education Fund (CeaseFirePA), and the City of Philadelphia (Philadelphia).

[2] The UFA is codified at 18 Pa. C.S. §§ 6101-6187.

[3] The Home Rule Law is codified at 53 Pa. C.S. §§ 2901-3171.

[4] Additionally, the following entities have submitted *amici curiae* briefs in support of Appellants' appeal: (1) the City of Pittsburgh; (2) the City of Scranton and several other Pennsylvania local governments and officials; (3) Brady and Giffords Law Center to Prevent Gun Violence; (4) Elizabeth Datner, M.D., and other doctors in the Philadelphia medical community, as well as the Coalition of Trauma Centers for Firearm Injury (continued…)

# I. BACKGROUND

## A. Underlying Legal Landscape

To put the issues presented before us today into better context, we set forth a review of various pertinent legal concepts, beginning with the preeminent role of our General Assembly in the lawmaking arena. Our state's Constitution vests the General Assembly with "[t]he legislative power of this Commonwealth." Pa. Const. art. II, § 1. This power, "in its most pristine form[,] is the power 'to make, alter[,] and repeal laws.'" *Blackwell v. State Ethics Comm'n*, 567 A.2d 630, 636 (Pa. 1989). This power is also plenary, save for limitations imposed by our state and federal constitutions. *See Luzerne Cnty. v. Morgan*, 107 A. 17, 17 (Pa. 1919) ("The legislature may do whatever it is not forbidden to do by the federal or state Constitution.").[5] Moreover, encompassed within the General Assembly's powers is the so-called "police power," which this Court has defined as, *inter alia*, the broad and flexible "power 'to promote the public health, morals[,] or safety and the general well-being of the community'" and the "inherent power of a body politic to enact and enforce laws for the promotion of the general welfare." *Nat'l Wood Preservers, Inc. v. Dep't of Env't Res.*, 414 A.2d 37, 42 (Pa. 1980) (quoting *Commonwealth v. Harmar Coal Co.*, 306 A.2d 308, 316 (Pa. 1973); *Commonwealth v. Barnes & Tucker*, 371 A.2d 461, 465 (Pa. 1977)). This police power is not only "one of

---

Prevention; and (5) the International Municipal Lawyers Association and A Better Balance. The following entities have submitted *amici curiae* briefs on behalf of Appellees: (1) Allegheny County Sportsmen's League and Firearms Owners Against Crime—Institute for Legal, Legislative, and Educational Action; and (2) Gun Owners of America, Inc., Gun Owners Foundation, and Heller Foundation. We have likewise reviewed and considered *amici*'s positions.

[5] *See also Commonwealth ex rel. Schnader v. Liveright*, 161 A. 697, 707 (Pa. 1932) ("Legislative power is vested in the General Assembly[,] . . . and its power is supreme on all such subjects, unless limited by the Constitution"); *Stilp v. Commonwealth*, 974 A.2d 491, 494-95 (Pa. 2009) ("[U]nlike the federal Constitution, the powers not expressly withheld from the General Assembly inhere in it.").

the most essential powers of government," but also one of the least limitable. *Adams Sanitation Co., Inc. v. Dep't of Env't Prot.*, 715 A.2d 390, 395 (Pa. 1998). In this regard, the General Assembly may exercise its far-reaching police power in the public interest in a manner that affects constitutional rights, though any such exercise is itself subject to constitutional limitations and judicial review. *Commonwealth v. Torsilieri*, 232 A.3d 567, 575 (Pa. 2020).

Indeed, we emphasize that, while it is the role of the General Assembly to enact laws, it is left to the courts to determine ultimately whether the General Assembly's exercise of legislative power transgresses constitutional bounds. *Commonwealth v. Zasloff*, 13 A.2d 67, 69 (Pa. 1940). This delineation of roles emanates from the well-recognized separation of powers doctrine, which "is inherent in the Pennsylvania Constitution" and "is essential to our tripartite governmental framework" consisting of a legislative, judicial, and executive branch. *Renner v. Ct. of Common Pleas of Lehigh Cnty.*, 234 A.3d 411, 419 (Pa. 2020). The doctrine "makes manifest that the three branches of government are co-equal and independent[] and divides power accordingly," with the underlying rationale of the doctrine being that it "prevents one branch of government from exercising, infringing upon, or usurping the powers of the other two branches." *Id.* This prohibition is also "related to the system of checks and balances, which prevents one branch from acting unchecked." *Id.* at 420.

In recognition of the above precepts, as well as the notion that the dividing lines among the three branches are at times indistinct and difficult to define, *Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 78 A.3d 1020, 1032 (Pa. 2013), we also observe the following points relative to the roles of the General Assembly and judiciary when it comes to public policymaking. It is the chief function of the General Assembly to set public policy. *Program Admin. Servs., Inc. v. Dauphin Cnty. Gen. Auth.*, 928 A.2d 1013, 1018

(Pa. 2007). "The domain of the judiciary is in the field of the administration of justice under the law; it interprets, construes[,] and applies the law." *Commonwealth v. Sutley*, 378 A.2d 780, 783 (Pa. 1977) (quoting *Commonwealth v. Widovich*, 145 A. 295, 299 (Pa. 1929)).[6] It is axiomatic that, in exercising our power of judicial review, we cannot use it as a means to substitute our own public policy judgments for those of the General Assembly. *Program Admin. Servs., Inc.*, 928 A.2d at 1018 (quoting *Parker v. Children's Hosp. of Phila.*, 394 A.2d 932, 937 (Pa. 1978)). This is not only because it would violate the separation of powers doctrine to do so,[7] but also because the courts are "at a disadvantage in the substantive lawmaking process"[8] given the adversarial nature of our judicial system and the dearth of resources that are otherwise available to our sister branch.[9] Notwithstanding, we emphasize that, even in the policymaking arena, the

---

[6] Article IV, Section 2 of the Pennsylvania Constitution vests "[t]he supreme executive power . . . in the Governor, who shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2.

[7] *Swords v. Harleysville Ins. Cos.*, 883 A.2d 562, 570 n.7 (Pa. 2005) (observing that legislation "may be harsh, so long as [it] is constitutional[;]" "policy determinations . . . are within the exclusive purview of the legislature[;] and it would be a gross violation of the separation of powers doctrine for us to intrude into that arena" (quoting *Glenn Johnston, Inc. v. Dep't of Rev.*, 726 A.2d 384, 388 (Pa. 1998.))).

[8] *Villani v. Seibert*, 159 A.3d 478, 492 (Pa. 2017) ("[J]udges plainly stand at a disadvantage in the substantive lawmaking process, which also, quite frankly, is often steeped in difficult political judgments, including choices among vital competing interests.").

[9] *See Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 333 & n.27 (Pa. 2010) (explaining that, "[u]nlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion" and noting that legislative branch has "broader tools available to [it] in making social policy judgments"); *Reichley by Wall v. N. Penn Sch. Dist.*, 626 A.2d 123, 129 (Pa. 1993) ("The adversarial judicial system is not an appropriate forum for analyzing whether this legislation works well or poorly, as intended or in ways unforeseen. If a statute does not work as expected, the legislature is the appropriate body to make the judgment and enact corrective legislation. That body has the competence to weigh the policy considerations and legislate initially and that body has the competence to reassess those considerations, (continued…)

General Assembly's actions are subject to constitutional restraints, with the courts serving as a bulwark to ensure that the constitutional rights of our citizens are protected in that context. *Torsilieri*, 232 A.3d at 583.

Having discussed the delineation of power between the legislative and judicial branches of our state government as is relevant to this appeal, we also take the opportunity to discuss another pertinent area of the law concerning the division of governmental power: the interplay between state and municipal governance. As a general matter, "[m]unicipalities are creatures of the state and have no inherent powers of their own." *City of Philadelphia v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004) (relying upon *Naylor v. Twp. of Hellam*, 773 A.2d 770, 773 (Pa. 2001)). The General Assembly's authority over municipalities' powers is "supreme," and, accordingly, municipalities "may do only those things which the [l]egislature has expressly or by necessary implication placed within their power to do." *Pa. Rest. & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 816 (Pa. 2019) (quoting *Denbow v. Borough of Leetsdale*, 729 A.2d 1113, 1118 (Pa. 1999)). Under usual circumstances, then, a municipality does not have "the power to enact ordinances except as authorized by statute, and any ordinance not in conformity with its enabling statute is void." *Schweiker*, 858 A.2d at 84.

The concept of home rule dispenses with the above paradigm. To begin, "[l]ike the powers of other types of municipalities, the powers of a home rule municipality are largely constitutionally and statutorily determined." *Devlin v. City of Philadelphia*, 862 A.2d 1234, 1242 (Pa. 2004). The Pennsylvania Constitution grants municipalities the

the efficacy of the initial legislation, and the wisdom of continuing thereunder or changing course.").

power of self-government through the enactment of home rule charters[10] in Article IX, Section 2, which provides:

> Municipalities shall have the right and power to frame and adopt home rule charters. Adoption, amendment or repeal of a home rule charter shall be by referendum. The General Assembly shall provide the procedure by which a home rule charter may be framed and its adoption, amendment or repeal presented to the electors. If the General Assembly does not so provide, a home rule charter or a procedure for framing and presenting a home rule charter may be presented to the electors by initiative or by the governing body of the municipality. *A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.*[11]

Pa. Const. art. IX, § 2 (emphasis added). As indicated by Article IX, Section 2, home rule allows a municipality to "legislate concerning municipal governance without express statutory warrant for each new ordinance; [a municipality's] ability to exercise municipal functions is limited only by its home rule charter, the Pennsylvania Constitution, and the General Assembly." *Schweiker*, 858 A.2d at 84; *Pa. Rest. & Lodging Ass'n*, 211 A.3d at 816 (explaining that "any power that the General Assembly did not forbid was now extended to any municipality that . . . adopted home rule").

Given that Article IX, Section 2 of the Pennsylvania Constitution renders the right of home rule "subject to the procedures and substantive limitations imposed by the General Assembly, home rule must ordinarily occur, in the first instance, according to enabling legislation at the state level." *Schweiker*, 858 A.2d at 84. There are two pieces

---

[10] The Home Rule Law, discussed in detail below, defines a "home rule charter" as "[a] written document defining the powers, structure, privileges, rights and duties of the municipal government and limitations thereon." 53 Pa. C.S. § 2902.

[11] "Article [IX], Section 2 became the constitutional authority for home rule when a new Pennsylvania Constitution was adopted in 1968. Prior to that time, the relevant provision was Article 15, Section 1, which was adopted in 1922 and was substantively identical to the current provision." *Spahn v. Zoning Bd. of Adjustment*, 977 A.2d 1132, 1143, n.5 (Pa. 2009).

of state-level enabling legislation pertinent here: (1) the First Class City Home Rule Act of 1949, Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157, and (2) the Home Rule Law. As its name makes obvious, the First Class City Home Rule Act was first enacted in 1949 and applies to cities of the first class—*i.e.*, Philadelphia, the only city of the first class in Pennsylvania. Section 1 of the First Class City Home Rule Act provides that "[a]ny city of the first class may frame and adopt a charter for its own government." 53 P.S. § 13101. Generally, the First Class City Home Rule Act grants to first class cities that adopt a home rule charter "all powers and authority of local self-government" and "complete powers of legislation and administration in relation to its municipal functions." 53 P.S. § 13131. Section 13131 of the First Class City Home Rule Act further provides:

> The charter of any city adopted or amended in accordance with this act may provide for a form or system of municipal government and for the exercise of any and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like effect, and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law.

*Id.*

Nonetheless, the First Class City Home Rule Act also provides that its general grant of powers is "[s]ubject to the limitations" provided therein, 53 P.S. § 13131, which limitations most significantly include those express limitations set forth in Section 13133 of the First Class City Home Rule Act. Section 13133 provides, in pertinent part:

> No city shall exercise any powers or authority beyond the city limits except such as are conferred by an act of the General Assembly . . . . Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are--
>
> . . . .
>
> (b) Applicable in every part of the Commonwealth.

(c) Applicable to all the cities of the Commonwealth . . . .

53 P.S. § 13133(b)-(c). In accordance with these provisions, our Court has similarly observed that first class city home rule charters are subordinate to and restricted by legislative acts and that the General Assembly "clearly and specifically reserved to itself the power to impose restrictions, limitations and regulations on any First Class City . . . Home Rule Charter." *Cali v. City of Phila.*, 177 A.2d 824, 827-28 (Pa. 1962) (emphasis omitted).

The Home Rule Law, enacted in 1996, applies to all municipalities other than cities and counties of the first class. 53 Pa. C.S. § 2901(b). Echoing Article IX, Section 2 of our Constitution and the aforementioned provisions of the First Class City Home Rule Act, the Home Rule Law "extends home[ ]rule authority only to 'function[s] not denied by the Constitution of Pennsylvania, by statute or by [the municipality's] home rule charter.'" *Pa. Rest. & Lodging Ass'n*, 211 A.3d at 816-17 (quoting 53 Pa. C.S. § 2961). Section 2964 of the Home Rule Law outlines municipalities' general powers, which include the power to "[a]dopt, amend and repeal any ordinances and resolutions as may be required." 53 Pa. C.S. § 2964(6).

The Home Rule Law also sets forth limitations on municipal powers. In this regard, the Home Rule Law provides*, inter alia*, that "[a] municipality shall not[] . . . [e]xercise powers contrary to or in limitation or enlargement of powers granted by statutes which are applicable in every part of this Commonwealth." 53 Pa. C.S. § 2962(c)(2). The Home Rule Law adds that "[s]tatutes that are uniform and applicable in every part of this Commonwealth shall remain in effect and shall not be changed or modified by this subpart. Statutes shall supersede any municipal ordinance or resolution on the same subject." 53 Pa. C.S. §2962(e). And, as mentioned above, the Home Rule Law serves as the source of one of the so-called FPLs challenged in this appeal, providing in Section 2962(g) that "[a] municipality shall not enact any ordinance or take any other

action dealing with the regulation of the transfer, ownership, transportation or possession of firearms." 53 Pa. C.S. § 2962(g).

Of further note on the contours of municipal home rule governance, our precedent counsels that "the General Assembly may negate ordinances enacted by home rule municipalities when the General Assembly has enacted a conflicting statute concerning 'substantive matters of statewide concern.'" *Devlin*, 862 A.2d at 1242 (quoting *Ortiz v. Commonwealth*, 681 A.2d 152, 156 (Pa. 1996)). This is as compared to ordinances pertaining to matters of purely local concern, which the General Assembly cannot abrogate. *Spahn*, 977 A.2d at 1144. Substantive matters of statewide concern include those "involving 'the health, safety, security and general welfare of all the inhabitants of the State,'" *Devlin*, 862 A.2d at 1242 (quoting *Lennox v. Clark*, 93 A.2d 834, 845 (Pa. 1953)), whereas matters "of purely local concern are those that affect the personnel and administration of the local government," *Spahn*, 977 A.2d at 1144, and "which are of no concern to citizens elsewhere." *Devlin*, 862 A.2d at 1242 (quoting *Lennox*, 93 A.2d at 845). Relatedly, while municipalities, like the Commonwealth, possess traditional police powers—a concept which "[h]ome rule incorporates and reinforces"—such powers are subordinate to the broader police powers enjoyed by the Commonwealth. *Pa. Rest. & Lodging Ass'n*, 211 A.3d at 817. Moreover, a municipality cannot exercise powers in a manner that violates basic preemption principles.[12] *Devlin*, 862 A.2d at 1242; *see also Nutter*, 938 A.2d at 411 ("[F]undamental principles of preemption also apply to the

---

[12] As a general matter, there are three types of preemption: (1) express preemption, where "the state enactment contains language specifically prohibiting local authority over the subject matter;" (2) conflict preemption, which "acts to preempt any local law that contradicts or contravenes state law;" and (3) field preemption, where "the state regulatory scheme so completely occupies the field that it appears the General Assembly did not intend for supplementation by local regulations." *Berner v. Montour Twp. Zoning Hearing Bd.*, 217 A.3d 238, 247 & n.11 (Pa. 2019) (quoting *Huntley & Huntley, Inc. v. Borough Council of Borough of Oakmont*, 964 A.2d 855, 863 (Pa. 2009); *Nutter v. Dougherty*, 938 A.2d 401, 404 (Pa. 2007)).

courts['] consideration of whether a given municipal exercise of power is in fact limited by an act of the General Assembly."). Nonetheless, in general, we presume that a home rule municipality's exercise of legislative power is valid, and we construe such power liberally, resolving any ambiguities relative thereto in the home rule municipality's favor. *Nutter*, 938 A.2d at 411; *Pa. Rest. & Lodging Ass'n*, 211 A.3d at 817; *see also* 53 Pa. C.S. § 2961 ("All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality.").

Case law abounds with instances in which local and state government have disputed their respective authority to act in a given area.[13] As the instant matter makes

---

[13] *See, e.g., Schweiker,* 858 A.2d at 78-88 (rejecting claim that Philadelphia's home rule powers included appointment authority over members of Philadelphia Parking Authority (PPA), a Commonwealth agency; General Assembly had authority to enact provisions transferring control of PPA from Philadelphia mayor to Commonwealth); *Holt's Cigar Co., Inc. v. City of Philadelphia*, 10 A.3d 902, 904-05 (Pa. 2011) (holding that state law preempted municipal ordinance regulating sale of certain tobacco items and other potential drug paraphernalia); *Hoffman Min. Co., Inc. v. Zoning Hearing Bd. of Adams Twp.,* 32 A.3d 587, 593 (Pa. 2011) (observing that General Assembly has preempted field of regulation relative to alcoholic beverages, anthracite strip mining, and banking); *Devlin*, 862 A.2d at 1247 (concluding that Philadelphia's extension of employee benefits to employees' life partners "lies within the City's explicit authority to legislate regarding matters of local concern" but that addition of life partners as protected class in ordinance's anti-discrimination provisions was beyond home rule authority); *Pa. Gaming Control Bd. v. City Council of Phila.*, 928 A.2d 1255, 1258, 1270 (Pa. 2007) (observing that Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. §§ 1101-1904, is "a statute of statewide concern that provides for slot machine gaming at a set number of licensed facilities within the Commonwealth" and holding that local ordinance which, *inter alia*, nullified decision of Gaming Board to locate two Category 2 licensed facilities in Philadelphia was "an unlawful and unconstitutional exercise of power"); *City of Pittsburgh v. Fraternal Ord. of Police, Fort Pitt Lodge No. 1*, 161 A.3d 160, 168-70 (Pa. 2017) (holding that home rule charter amendment modifying rights under Act 111, which was "applicable to every political subdivision of this Commonwealth," was unenforceable); *Spahn*, 977 A.2d at 1144-45 (holding that local provision conferring taxpayer standing must cede to more restrictive provision in First Class City Home Rule Act and reasoning that, while zoning is generally matter of purely local concern, question of standing to appeal is substantive matter of statewide concern).

clear, this power struggle has been at play in the specific realm of firearms regulation for decades. To illustrate, we highlight our decision in *Ortiz*, decided in 1996. At the center of *Ortiz* was the UFA's preemption provision—the second of the so-called FPLs challenged in this appeal—which is set forth in Section 6120(a) of that act and provides: "(a) General rule.--No county, municipality or township may in any manner regulate the lawful ownership, possession, transfer or transportation of firearms, ammunition or ammunition components when carried or transported for purposes not prohibited by the laws of this Commonwealth." 18 Pa. C.S. § 6120(a).

*Ortiz* concerned challenges, brought in the Commonwealth Court's original jurisdiction, to the UFA's preemption of local ordinances enacted in Philadelphia and Pittsburgh (*i.e.*, two home rule municipalities) that banned assault weapons on the grounds that Section 6120(a) of the UFA violated the Pennsylvania Constitution, home rule charter, and First Class City Home Rule Act. Of note, the ordinances at issue "undisputed[ly] . . . purport[ed] to regulate the ownership, use, possession or transfer of certain firearms." *Ortiz*, 681 A.2d at 154. The Commonwealth Court dismissed the action on preliminary objections for failure to state a cause of action. On appeal, this Court observed:

> The sum of the case is that the Constitution of Pennsylvania requires that home rule municipalities may not perform any power denied by the General Assembly; the General Assembly has denied all municipalities the power to regulate the ownership, possession, transfer or possession of firearms; and the municipalities seek to regulate that which the General Assembly has said they may not regulate. The inescapable conclusion, unless there is more, is that the municipalities' attempt to ban the possession of certain types of firearms is constitutionally infirm.

*Id.* at 155.

Turning to the appellants' arguments, the Court in *Ortiz* first rejected the claim that Section 18 of the First Class City Home Rule Act provided that Philadelphia was "limited by the acts of the General Assembly only if those acts were applicable in the entire

[C]ommonwealth" and that the UFA was not so applicable because it treated Philadelphia disparately in at least one provision.[14]  *Ortiz*, 681 A.2d at 155.  The Court reasoned that the UFA's preemption provision applied universally and the fact that the UFA has one section applicable only to Philadelphia was of no moment.  *Id.*  The Court next rejected the appellants' argument that "the right of a city to maintain the peace on its streets through the regulation of weapons is intrinsic to the existence of [city] government . . . and, accordingly, an irreducible ingredient of constitutionally protected Home Rule."  *Id.* at 155-56.  The Court concluded that the appellants' claim was "frivolous" because, as mandated by Article IX, Section 2 of the Pennsylvania Constitution, the General Assembly could limit home rule municipal functions.  *Id.* at 156.

Finally, the Court addressed the assertion that, according to precedent, the General Assembly could restrict the power of home rule municipalities only when the General Assembly enacted statutes on matters of statewide concern.  The Court rejected this claim on the ground that "the matters at issue in [*Ortiz*] are substantive matters of statewide concern."  *Ortiz*, 681 A.2d at 156.  Observing that Article I, Section 21 of the Pennsylvania Constitution provides that "[t]he right of the citizens to bear arms in defense of themselves and the [s]tate shall not be questioned," the Court opined:

> Because the ownership of firearms is constitutionally protected, its regulation is a matter of statewide concern. The constitution does not provide that the right to bear arms shall not be questioned in any part of the [C]ommonwealth except Philadelphia and Pittsburgh, where it may be abridged at will, but that it shall not be questioned in any part of the [C]ommonwealth. Thus, regulation of firearms is a matter of concern in all of Pennsylvania, not merely in Philadelphia and Pittsburgh, and the General Assembly, not city councils, is the proper forum for the imposition of such regulation.

---

[14] As discussed further below, the UFA requires that a person be licensed to carry weapons openly in Philadelphia, whereas a person can open carry without a license elsewhere in the Commonwealth.  *Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019).

[J-44-2023] - 13

*Id.* Accordingly, the Court affirmed the Commonwealth Court's order dismissing the appellant's action.

As noted by the parties before us, there are cases decided both prior to and following *Ortiz*, many from the Commonwealth Court, which have measured particular local firearms regulations against Section 6120(a) of the UFA and determined that those regulations must fall on the grounds of preemption.[15] In focusing on Section 6120, however, it is important to be mindful that this provision is just one of many in the UFA's relatively longstanding and comprehensive statutory scheme of firearms regulation. Indeed, the General Assembly first enacted the UFA on December 6, 1972, and has since amended it on several occasions throughout the ensuing fifty-plus years, in part to address crime and protect the citizens of this Commonwealth while taking care to

---

[15] *See, e.g., Schneck v. City of Philadelphia*, 383 A.2d 227, 229-30 (Pa. Cmwlth. 1978) ("We believe that [Section 6120 of the UFA] clearly preempts local governments from regulating the lawful ownership, possession[,] and transportation of firearms, and we also believe that Philadelphia's ordinance [regulating the acquisition and transfer of firearms in the city] attempts to regulate firearms in the manner indicated in the statute as prohibited."); *Dillon v. City of Erie*, 83 A.3d 467, 473 (Pa. Cmwlth. 2014) (holding that Section 6120(a) of UFA "preempts all firearms regulation thereby prohibiting the City [of Erie] from regulating the possession of firearms in its parks via" local ordinance); *City of Phila. v. Armstrong*, 271 A.3d 555, 561-62, 565 (Pa. Cmwlth. 2022) (observing that, following *Ortiz*, Commonwealth Court has "on a variety of occasions[] . . . struck down legislation passed at the local level on the ground that the legislation was preempted by Section 6120(a) of the UFA" (collecting cases); further holding that Section 6120 preempted local regulation at issue relating to failure to report lost or stolen firearms); *Firearm Owners Against Crime v. City of Pittsburgh*, 276 A.3d 878, 895 (Pa. Cmwlth. 2022) (holding that Section 6120(a) of UFA preempts primary operative provisions of Pittsburgh ordinances relating to prohibitions on assault weapons and large capacity magazines, and ordinance concerning extreme risk protection orders); *Anderson v. City of Pittsburgh* (Pa. Cmwlth., No. 1753 C.D. 2019, filed May 27, 2022), slip op. at 6, 9 (observing that it is companion case to *Firearm Owners Against Crime* and concluding that Section 6120(a) of UFA preempts large capacity magazine ordinance). Notably, the local municipalities and officials in *Armstrong, Firearm Owners Against Crime*, and *Anderson* filed petitions for allowance of appeal in this Court, and we have held those petitions (docketed at 81 EAL 2022, 174 WAL 2022, and 175 WAL 2022) pending disposition of the instant matter.

underscore the fundamental nature of the right to bear arms enshrined in our Constitution.[16] In its current form, the UFA contains over 35 provisions relating to the regulation of firearms.

The UFA's provisions include a multitude of requirements for the ownership, possession, transfer, and transportation of firearms.[17] For instance, in addition to prohibiting minors from possessing or transporting firearms, 18 Pa. C.S. § 6110.1(a), the UFA prohibits persons convicted of certain enumerated offenses or who have engaged in other disqualifying conduct from possessing, using, controlling, selling, transferring, or manufacturing firearms or obtaining a license for such activity.[18] 18 Pa. C.S. § 6105(a)(1). Moreover, while the UFA is generally silent as to open carry restrictions,

---

[16] *See, e.g.*, Act of June 13, 1995, P.L. 1024 ("The General Assembly hereby declares that the purpose of this act is to provide support to law enforcement in the area of crime prevention and control, that it is not the purpose of this act to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, transfer, transportation or use of firearms, rifles or shotguns for personal protection, hunting, target shooting, employment or any other lawful activity, and that this act is not intended to discourage or restrict the private ownership and use of firearms by law-abiding citizens for lawful purposes or to provide for the imposition by rules or regulations of any procedures or requirements other than those necessary to implement and effectuate the provisions of this act. The General Assembly hereby recognizes and declares its support of the fundamental constitutional right of Commonwealth citizens to bear arms in defense of themselves and this Commonwealth.").

[17] In providing a somewhat brief and selective summary of the UFA's provisions, we do so in general terms for ease of discussion and note that it contains a myriad of exceptions to the broad pronouncements set forth above.

[18] The UFA additionally prohibits the alteration or obliteration of a firearm's manufacturer's number, 18 Pa. C.S. § 6117, and the possession of a firearm with an altered or obliterated manufacturer's number, 18 Pa. C.S. § 6110.2, as well as the use of certain bullets. 18 Pa. C.S. § 6121(a) ("It is unlawful for any person to possess, use or attempt to use a KTW teflon-coated bullet or other armor-piercing ammunition while committing or attempting to commit a crime of violence . . . ."). The UFA also contains provisions requiring firearms tracing in the event local law enforcement confiscates or recovers a firearm from anyone illegally possessing it, 18 Pa. C.S. § 6127, in addition to provisions addressing the abandonment of firearms, weapons, or ammunition, 18 Pa. C.S. § 6128.

the UFA does require a license for anyone to carry a firearm in any vehicle or concealed on or about one's person outside his home or place of business. 18 Pa. C.S. § 6106(a).[19] The UFA's general silence on open carry restrictions is also subject to one exception of particular importance herein, mentioned above: the UFA provides that "[n]o person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class [*i.e.*, Philadelphia] unless . . . such person is licensed to carry a firearm[] or . . . such person is exempt from licensing under [S]ection 6106(b) of [the UFA]." 18 Pa. C.S. § 6108.

Section 6109 of the UFA governs licenses to carry firearms. To obtain a license to carry, an individual must be at least 21 years old and must complete an application with the county sheriff (or, in the case of an applicant residing in a city of the first class, the chief of police of that city). 18 Pa. C.S. § 6109(b). In completing the application, the individual, *inter alia*, verifies that he has never been convicted of a crime prohibiting him "from possessing or acquiring a firearm under Federal or State law" and that he is "of sound mind." 18 Pa. C.S. § 6109(c). The licensing process also entails an investigation into matters such as the individual's "character and reputation" and "criminal background, juvenile delinquency and mental health." 18 Pa. C.S. § 6109(d)(1)-(5). Pursuant to Section 6109(e), a license shall be issued to an individual following the investigation if it appears that "no good cause exists to deny the license" and an individual does not meet any of the disqualifying criteria set forth therein. 18 Pa. C.S. § 6109(e)(1)(i)-(xiv) (providing that license shall not be issued to individuals "whose character and reputation

---

[19] *See also* 18 Pa. C.S. § 6106.1(a) (providing that, with exception, "no person shall carry a loaded pistol, revolver, shotgun or rifle, other than a firearm as defined in section 6102 (relating to definitions), in any vehicle"); 18 Pa. C.S. § 6107(a) (providing general rule that "[n]o person shall carry a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive").

is such that the individual would be likely to act in a manner dangerous to public safety," who have been convicted or adjudicated delinquent for certain offenses, who are not of sound mind, etc.); *see also* 18 Pa. C.S. § 6109(g) (upon receipt of application, "sheriff shall, within 45 days, issue or refuse to issue a license"); 18 Pa. C.S. § 6109(i) (providing for license revocation).

Section 6111 of the UFA relates to the sale or transfer of firearms, and its provisions pertain to both retail dealers and private sellers.[20] The UFA requires retail dealers to be licensed to sell or transfer firearms. *See* 18 Pa. C.S. § 6112 ("Retail dealer required to be licensed"); 18 Pa. C.S. § 6113 ("Licensing of dealers"). Section 6111 includes provisions setting forth the time and manner of delivery of firearms and imposes various duties upon sellers relative to firearms transactions. 18 Pa. C.S. § 6111(a)-(c). Pertinently, such duties include requesting that the Pennsylvania State Police (PSP) "conduct a criminal history, juvenile delinquency history[,] and a mental health record check" on the purchaser; receiving an approval number from the PSP in response; and issuing a receipt containing that approval number to the purchaser in connection with the sale. 18 Pa. C.S. § 6111(b)(3)-(5). Of further note, the UFA generally prohibits the making of "loan[s] secured by mortgage, deposit[,] or pledge of a firearm," or the lending or giving of firearms. 18 Pa. C.S. § 6115(a).

---

[20] *See* 18 Pa. C.S. § 6111(b) (providing that "[n]o licensed importer, licensed manufacturer or licensed dealer shall sell or deliver any firearm to another person, other than a licensed importer, licensed manufacturer, licensed dealer or licensed collector, until the conditions of [Section 6111(a) of the UFA] have been satisfied and until he has" complied with Section 6111(b)); 18 Pa. C.S. § 6111(c) ("Any person who is not a licensed importer, manufacturer or dealer and who desires to sell or transfer a firearm to another unlicensed person shall do so only upon the place of business of a licensed importer, manufacturer, dealer or county sheriff's office, the latter of whom shall follow the procedure set forth in [Section 6111 of the UFA] as if he were the seller of the firearm. The provisions of this section shall not apply to transfers between spouses or to transfers between a parent and child or to transfers between grandparent and grandchild.").

By way of enforcement, the UFA imposes criminal penalties for noncompliance in several instances.[21] Additionally, the General Assembly has tasked the PSP with administering the UFA.[22] As part of its administrative duties, the PSP must complete the necessary background checks requested in connection with firearms purchases, 18 Pa. C.S. § 6111.1(b)(1), distribute firearm safety brochures that summarize the UFA's major provisions and which are to be provided to each firearms purchaser, 18 Pa. C.S. §§ 6111.1(d), 6125, and annually report statistics related to firearms purchases and crime reporting to the General Assembly. 18 Pa. C.S. § 6111.1(i).

Having provided the above overview, we reiterate that, while the UFA has been in force since 1972, it has not been a static statutory framework since that time. Rather, the General Assembly has, over the course of decades, legislated on the topic of firearms via the UFA's provisions in order to balance the right of the citizens of this Commonwealth to bear arms and the desire to aid in the area of crime prevention and control. For instance, in the 1980s and 1990s alone, the General Assembly enacted a slew of amendments to the UFA, wherein the General Assembly, *inter alia*: (1) added Section 6110.1 of the UFA, relating to the prohibition against possession of a firearm by a minor; (2) added Section 6110.2, relating to the prohibition against possessing a firearm with an altered

---

[21] *See, e.g.*, 18 Pa. C.S. § 6105(a.1) (penalties for offense of persons not to possess firearms); 18 Pa. C.S. § 6105.2(h) (penalty for intentionally or knowingly failing to relinquish firearm when required); 18 Pa. C.S. § 6106.1(b) (penalty for carrying loaded weapons other than firearm in vehicle); 18 Pa. C.S. § 6110.2(b) (penalty for possessing firearm with altered manufacturer's number); 18 Pa. C.S. § 6111(g) (penalties for violating firearms sale and transfer provisions); 18 Pa. C.S. § 6117(c) (penalty for altering or obliterating marks of identification); 18 Pa. C.S. § 6119 ("Except as otherwise specifically provided, an offense under this subchapter constitutes a misdemeanor of the first degree").

[22] 18 Pa. C.S. § 6111.1(a); *see also* 18 Pa. C.S. § 6111.5 (providing that PSP "shall in the manner provided by law promulgate the rules and regulations necessary to carry out" UFA); 18 Pa. C.S. § 6124 (providing that PSP "commissioner may establish form specifications and regulations[] . . . with respect to uniform forms control, including," *inter alia*, as to licenses to carry and dealer's licenses).

manufacturer's number; (3) amended Section 6105 of the UFA to expand the categories of people prohibited from possessing firearms; (4) amended Section 6111 to provide more fulsome requirements related to the sale and transfer of firearms; (5) added Section 6121, relating to the prohibition against the use of certain bullets; (6) added Sections 6111.1, 6111.5, 6124, and 6125, relating to administration by and responsibilities of the PSP; and (7) enacted comprehensive amendments to Section 6109, relating to licenses to carry firearms.[23] Such activity demonstrates that the General Assembly is and has been exercising its state lawmaking power in the realm of firearms regulation for quite some time.

With this legal background in mind, we turn to the current dispute. In doing so, we observe at the outset that this case is atypical in the sense that Appellants do not present the Court with a question of whether a specific local ordinance is lawful in light of the FPLs, nor do they ask us to opine on the scope of the FPLs' preemptive reach. Instead, Appellants, in an attempt to gain the ability to enact local gun control legislation not heretofore enacted by the General Assembly, raise novel challenges to the constitutionality and validity of the FPLs themselves based on three legal theories: (1) a violation of substantive due process under Article I, Section 1 of the Pennsylvania Constitution; (2) a violation of the so-called "state-created danger doctrine;" and (3) improper interference with Philadelphia's delegated duties under the Local Health

---

[23] *See* Act of December 21, 1984, P.L. 1210; Act of December 19, 1988, P.L. 1275; Act of June 13, 1995, P.L. 1024; Act of December 15, 1999, P.L. 915. Other notable amendments include the addition of certain firearms restrictions and penalties in Section 6105 of the UFA relative to individuals subject to protection from abuse orders and individuals convicted of domestic abuse, effectuated through the Act of November 10, 2005, P.L. 335, as well as the addition of Section 6127 of the UFA (relating to firearm tracing) by the Act of July 17, 2007, P.L. 139, and the addition of Section 6105.2 of the UFA (concerning relinquishment of firearms and firearms licenses by convicted persons) and Section 6128 of the UFA (addressing abandonment of firearms, weapons, or ammunition) by the Act of October 12, 2018, P.L. 519.

Administration Law (LHAL)[24] and Disease Prevention and Control Law of 1955 (DPCL).[25] We address these claims below.

### B. The Present Matter

Appellants filed the instant Petition in the Commonwealth Court's original jurisdiction on October 7, 2020, naming Appellees the Commonwealth of Pennsylvania (Commonwealth), the Pennsylvania General Assembly (General Assembly), Bryan Cutler, in his official capacity as then-Speaker of the Pennsylvania House of Representatives (Speaker), and Joseph P. Scarnati III, in his official capacity as then-President Pro Tempore of the Pennsylvania Senate (President Pro Tempore), as respondents.[26] According to the Petition, Citizens are Black and Hispanic residents of impoverished neighborhoods located in and around Philadelphia and Pittsburgh. Further, Citizens have been directly impacted by gun violence by way of the loss of family members and others who have died by gunfire and by living in constant fear for the lives and safety of themselves and their loved ones because of an ongoing threat of gun violence in their communities. (*See* Petition, 10/7/2020, at 4-17, ¶¶ 9-18.) CeaseFirePA "is a Pennsylvania nonprofit organization headquartered in Philadelphia," and its "mission is to end the epidemic of gun violence across the Commonwealth . . . through education, coalition building, and advocacy in support of sensible gun laws and public policies." (*Id.*

---

[24] Act of August 24, 1951, P.L. 1304, *as amended*, 16 P.S. §§ 12001-12030.

[25] Act of April 23, 1956, P.L. (1955) 1510, *as amended*, 35 P.S. §§ 521.1-.21.

[26] Since the time of the Petition's filing, Jacob Corman III replaced Mr. Scarnati as the President Pro Tempore of the Senate, and Kim Ward subsequently replaced Mr. Corman. The caption now accurately reflects that information. Moreover, the Speakership has changed twice, and Joanna McClinton is now the Speaker. Of further note, after being replaced as the Speaker, Mr. Cutler submitted to this Court a request for leave to intervene, which we denied. Mr. Cutler, however, had submitted a brief to this Court, and Ms. McClinton asked this Court to strike that brief. We granted that request. This series of events resulted in Mr. Cutler filing an application in this Court, wherein he asked that he be designated as an *amicus curiae* and that his previously filed brief be treated as an *amicus* filing. We granted that request as well.

at 18, ¶¶ 19-20.) "Philadelphia is a municipal corporation and political subdivision of the Commonwealth," a home rule municipality, a city of the first class, and "coextensive with the County of Philadelphia, a county of the first class." (*Id.* at 18, ¶¶ 21-22.) Additionally, Philadelphia "is home to almost 1.6 million residents," including "many communities of color and low-income communities, groups that are especially vulnerable to the harms caused by gun violence." (*Id.* at 18, ¶ 23.)

Appellants assert that gun violence in Pennsylvania constitutes a public health crisis that is disproportionately impacting discrete communities, as described in the Petition. (*Id.* at 20-28, ¶¶ 28-39.) Appellants aver that, in response, affected local governments are seeking to enact or enforce various gun safety regulations to address that epidemic at the community level. (*See id.* at 61-78, ¶¶ 90-125.) Appellants further aver that, notwithstanding Appellees' awareness of this gun violence epidemic and of the effectiveness of the gun safety measures that local governments seek to take to protect their residents, Appellees have prevented such local legislative action and knowingly exacerbated the epidemic by engaging in a decades-long practice of passing, amending, expanding, and enforcing the FPLs at the state level while failing to enact effective statewide gun violence prevention measures. (*See id.* at 35-61, ¶¶ 54-89.)

To illustrate, Appellants allege that the General Assembly first added Section 6120 of the UFA to the statutory scheme in 1974—at which time the provision pertained only to the regulation of firearms—in the face of warnings from legislators hailing from districts in and around Philadelphia on the grave effects that would result from such an enactment relative to gun violence. (*Id.* at 39-44, ¶¶ 63-66.) Appellants also point out that, in 1987, the General Assembly expanded Section 6120 to cover regulation of ammunition and ammunition components in addition to firearms and, in 1993, provided a more expansive definition of the word "firearms" as used in that

provision. (*Id.* at 45-46, ¶¶ 68-69.) Appellants highlight that the 1993 amendment was likewise hotly debated and even survived a veto by then-Governor Bob Casey during the legislative process, with certain members of the General Assembly and the Governor warning about the negative consequences that such an amendment would have on gun violence, which warnings were ultimately ignored. (*Id.* at 45-52, ¶¶ 69-77.) Appellants further highlight that, in 1999, the General Assembly amended Section 6120 to prohibit actions at law or equity against firearms and ammunition manufacturers, yet again despite warnings of the damaging results such an amendment would have on the safety of Pennsylvania citizens, especially in Philadelphia. (*Id.* at 53-55, ¶¶ 79-82.) Appellants also note that, in 2013, the General Assembly amended Section 6120 to provide a private right of action to individuals "adversely affected" by a local ordinance preempted by the FPLs over protestations from various legislators, though this Court ultimately invalidated that amendment on single-subject rule grounds.[27] (*Id.* at 56-59, ¶¶ 83-87.) Appellants add that, in the interim of these amendments to Section 6120—in 1996—the General Assembly enacted Section 2962(g) of the Home Rule Law. (*Id.* at 52, ¶ 78.) Appellants further note that, beyond enacting the aforementioned amendments, the General Assembly has refused to repeal or narrow the FPLs more than a dozen times since 2000, despite its awareness of the harm the FPLs cause. (*Id.* at 60, ¶ 88.)

In light of the above, Appellants allege that the Commonwealth has prevented and continues to prevent municipalities from enacting and enforcing local ordinances via the FPLs while "municipalities, organizations, and individual constituents continue to suffer." (*Id.* at 61, ¶¶ 89.) Appellants specifically submit that, but for the FPLs, Philadelphia and other municipalities would enact local gun safety measures, such as "permit-to-purchase"

---

[27] *Leach v. Commonwealth*, 141 A.3d 426, 434-35 (Pa. 2016).

requirements,[28] "one-gun-per-month" purchase limits, and procedures for obtaining "extreme risk protection orders" (ERPOs),[29] or otherwise enforce such local measures which are already "on the books" but are not in effect because of the FPLs. (*Id.* at 61-78, ¶¶ 90-125.) Appellants add that ample data evidences that these kinds of regulations would reduce the risk of gun violence and that, by preventing the passage and enforcement of these types of regulations, Appellees have increased the risks of gun violence in Appellants' communities. (*Id.*; *see also id.* at 78-79, ¶¶ 126-30.)

Based on the foregoing, Appellants assert three causes of action in their Petition. Appellants' first count is premised upon Article I, Section 1 of the Pennsylvania Constitution[30] and the so-called "state-created danger" doctrine, a concept borne out of federal substantive due process principles that, as discussed further below, permits a plaintiff to obtain relief against a state actor for conduct that creates or increases a private danger that causes injury to a plaintiff. (*See id.* at 79-81, ¶¶ 131-38.) In their second cause of action, Appellants allege that Appellees have violated Appellants' substantive due process rights to "enjoy[] and defend[] life and liberty" under Article I, Section 1, including their right "to collectively enact measures that safeguard against gun violence," by depriving Appellants of those rights without due process of law through the FPLs. (*Id.*

---

[28] Appellants explain that "[p]ermit-to-purchase systems involve an application to a state or local law enforcement agency and a background check that is often facilitated by fingerprints. Law enforcement has, on average, 30 days to complete the check. Sellers, both licensed and private, can only sell to a potential firearm purchaser with a valid license." (Petition at 64, ¶ 94.)

[29] ERPO ordinances would put in place "procedures for disarming firearm owners who pose an extreme risk of physical harm to themselves or others but have not yet acted." (Petition at 74, ¶ 116.)

[30] Article I, Section I of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1.

at 81-83, ¶¶ 139-44.)  The third cause of action, brought on behalf of Philadelphia alone, asserts that Appellees, again by way of the FPLs and the absence of adequate statewide firearm regulations,[31] have improperly interfered with the public health responsibilities (*i.e.*, the duty to address gun violence) that the Commonwealth has delegated to political subdivisions under the LHAL[32] and DPCL.[33] (*Id.* at 83-86, ¶¶ 145-52.)

By way of relief, Appellants generally seek, *inter alia*:  (1) a declaration that Appellees' actions and further enforcement of the FPLs violate Article I, Section 1 of the Pennsylvania Constitution; (2) a declaration that Appellees' actions have deprived Philadelphia of its ability to fulfill its delegated duties and violated the Commonwealth's obligation to maintain order and preserve the safety and welfare of all citizens; and (3) a permanent injunction compelling Appellees to cease their aforementioned violations and preventing further enforcement of the FPLs.  (*Id.* at 81, 83, 86-87, ¶¶ 138, 144, 152-56.)

Appellees filed various preliminary objections to the Petition, including demurrers directed to all three counts, and Appellants filed answers in response.  The parties filed briefs in support of their respective positions, and the Commonwealth Court, sitting en banc, heard oral argument on the matter.  Thereafter, as further discussed below, the en banc panel issued a split decision, sustaining Appellees' preliminary objections

---

[31] While Appellants' third cause of action as pled in the Petition challenges the FPLs generally (*i.e.*, both Section 6120 of the UFA and Section 2962(g) of the Home Rule Law), it is undisputed that Section 2962(g) of the Home Rule Law does not apply to Philadelphia. *See* 53 Pa. C.S. § 2901(b) (providing that Home Rule Law "applies to all municipalities except cities of the first class and counties of the first class").

[32] Relevant here, the LHAL provides that "[t]he protection and promotion of the health of the people . . . is one of the highest duties of the Commonwealth," 16 P.S. § 12002(a), and that county departments of health "shall prevent or remove conditions which constitute a menace to public health."  16 P.S. § 12010(c).

[33] The DPCL provides, in pertinent part, that "[l]ocal boards and departments of health shall be primarily responsible for the prevention and control of communicable and non-communicable disease."  35 P.S. § 521.3(a).

challenging the legal sufficiency of the three counts in the Petition and dismissing the Petition with prejudice.

## C. Commonwealth Court Opinions[34]

### 1. Plurality

The Plurality first concluded that Appellants had failed to state a legally sufficient claim under the state-created danger doctrine. The Plurality began by noting that, in *Johnston v. Township of Plumcreek*, 859 A.2d 7 (Pa. Cmwlth. 2004), *appeal denied*, 877 A.2d 463 (Pa. 2005), the Commonwealth Court rejected an attempt to use the state-created danger doctrine as a means by which to nullify certain township ordinances on the ground that the doctrine had "never been used to nullify a statute or ordinance" and was, instead, "a construct by which damages are awarded for constitutional torts." *Crawford v. Commonwealth*, 277 A.3d 649, 664-65 (Pa. Cmwlth. 2022) (plurality) (quoting *Johnston*, 859 A.2d at 13-14). Stating that it could summarily dispose of Appellants' claim by holding that the state-created danger doctrine cannot be used to declare the FPLs unconstitutional given its binding decision in *Johnston* and "preserv[ing] this reasoning as a legal basis for [its] conclusion in the event of a further appeal," the Plurality nonetheless proceeded to apply the doctrine to Appellants' claim. *Id.* at 665.

Relying upon *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), and other federal authority, the Plurality observed that, while substantive due process requirements generally do "not impose on the state an affirmative duty to protect individuals against private acts of violence," the state-created

---

[34] The Commonwealth Court en banc panel consisted of then-Judge, now President Judge Cohn Jubelirer, as well as Judges McCullough, Wojcik, Fizzano Cannon, and Ceisler. Judge McCullough authored the opinion announcing the judgment of the court (Plurality), with Judge Fizzano Cannon concurring in the result only. Then-Judge Cohn Jubelirer wrote a concurring opinion, and Judge Ceisler wrote a dissenting opinion joined by Judge Wojcik.

danger doctrine provides a caveat to this precept where "the state's own actions create the very danger that causes the plaintiff's injury." *Id.* (quoting *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013)). The Plurality continued:

> To prevail on a substantive due process claim under the state-created danger doctrine, a petitioner must prove each of the following elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the petitioner existed such that the petitioner was a foreseeable victim of the respondents' acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that had rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* at 665-66 (quoting *Henry v. City of Erie*, 728 F.3d 275, 281-82 (3d Cir. 2013)).

Focusing particularly on precedent that rejected attempts to invoke the state-created danger doctrine in instances where a government's "ineffective policy or practice" was the asserted act giving rise to liability, the Plurality opined:

> [The] case law clearly establishes that a state cannot be found to have violated the state-created danger doctrine by enacting a statute and/or policy that is generally applicable, even if the statute and/or policy is arguably ineffective and fails to adequately protect the public from private acts of violence. This is because such laws are inherently directed at the public in general and not at any specific individual or discrete class of individuals. Regardless of [Appellants'] averments in the [Petition], the UFA is a relatively comprehensive regulatory regime, containing protective measures designed to combat gun violence. Further, Section 6120(a) [of the UFA] is equally applicable across and throughout this Commonwealth, applying to each and every county or municipality; thus, it is directed at the public at large and not toward any of [Appellants] in particular.

*Id.* at 667-69 (citing, *inter alia*, *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 913 n.12 (3d Cir. 1997); *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 866 (5th Cir. 2012) (en banc)). The Plurality added that "[a] State's adoption of generally[ ]applicable policies [ ] does not foist upon anyone an immediate threat of harm having a limited range and duration," and "[t]he act of establishing such policies [by] itself

does not put any particular individual at substantial risk of serious, immediate, and proximate harm." *Id.* at 670 (quoting *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 926 (10th Cir. 2012)); *see also id.* (explaining that "the UFA does not actively promote, much less mandate, citizens to inflict harm upon each other with firearms" and that any claim that UFA allows certain dangerous individuals to obtain firearms or firearm licenses fails for lack of immediate threat of harm and foreseeable victim).

The Plurality also observed that Appellants' averments challenged "the democratic nature of the legislative process itself" while failing to appreciate that Section 6120(a) of the UFA is "a duly enacted law expressing the will, wisdom, and judgment of the General Assembly" and "dictates, without exception, that it is the sole prerogative of our General Assembly to enact laws in the field of firearm regulation on a statewide basis." *Id.* at 671. The Plurality continued:

> Tellingly, the incidents of gun violence listed and described in the [Petition] were all situations where a private actor committed a private act of violence. As such, the role that the UFA played in overall scenarios is entirely imaginative and speculative, because there are multiple, indeed countless, variables that account for—or contributed toward—the actual incidents of violence in the unique circumstances of each case, including the identity and background of the perpetrator and things such as motive or intent.

*Id.* The Plurality added that, "even if the General Assembly was aware that certain geographical areas and/or members of society could potentially be exposed to gun violence on a greater scale, the General Assembly had a legitimate countervailing government interest in passing Section 6120(a)"—*i.e.*, the need for uniformity in gun regulation, which it addressed through preemption. *Id.* (relying upon *Walker v. Detroit Pub. Sch. Dist.*, 535 Fed. Appx. 461 (6th Cir. 2013) (concluding that, even when plaintiff asserting claim under state-created danger doctrine "can show that the state had a 'subjective awareness of substantial risk of serious injury'" in making particular policy choices, "a court must 'make some assessment that [the state] did not act in furtherance

of a countervailing governmental purpose that justified taking that risk'") (quoting *Hunt v. Sycamore Comm. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 541 (6th Cir. 2008)).  Finally, the Plurality concluded that Appellants had failed to sufficiently allege that they belong to an identifiable and discrete class for purposes of the state-created danger doctrine. Accordingly, the Plurality concluded that Appellants had failed to state a legally sufficient claim for relief under the state-created danger doctrine.

Turning next to Appellants' substantive due process claim, the Plurality first concluded that Appellants had "failed to articulate the deprivation of a fundamental right." *Id.* at 675.  The Plurality explained that, while Appellants "assert[ed] a fundamental right to 'defend life and property,' . . . they couch[ed] this purported right as a right to be free from gun violence and a right to have [Philadelphia] and other municipalities enact local gun control ordinances."  *Id.*  The Plurality reasoned that Appellants, however, "do not possess a general constitutional right to have the government protect them from private acts of violence" and that "it is well settled that Section 6120(a) [of the UFA] is a valid exercise of legislative authority, and our General Assembly acted within the confines of the Pennsylvania Constitution, particularly [A]rticle [IX], [S]ection 2, when it decided to preempt local laws in the area of firearm regulation."  *Id.* (footnote omitted) (relying upon *Ortiz*, 681 A.2d at 154-56).  The Plurality, nonetheless, concluded that the FPLs were subject to rational-basis review and passed constitutional muster under that standard. Accordingly, the Plurality concluded that Appellants' substantive due process claim was legally insufficient.

Finally, the Plurality concluded that Philadelphia had failed to state a claim for which relief could be granted relative to Appellees' alleged interference with its delegated responsibilities under the LHAL and DPCL.  The Plurality first held that the General Assembly did not appear to delegate to Philadelphia the authority to enact gun control

laws via the LHAL and DPCL under a plain reading of those statutes. The Plurality added that, more importantly, Philadelphia is a home rule municipality "prohibited from 'exercis[ing] powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are . . . [a]pplicable in every part of the Commonwealth.'" *Id.* at 677 (quoting 53 P.S. § 13133(b)). The Plurality reasoned that this Court in *Ortiz* "held that Section 6120(a) [of the UFA]'s directive that the General Assembly exclusively govern matters concerning the ownership, possession, transfer, or transportation of firearms evidenced an issue of statewide concern, and, the statute, being equally applicable throughout the Commonwealth, deprived municipalities of authority to regulate these subjects, including [Philadelphia]." *Id.* (citing *Ortiz*, 681 A.2d at 156, and *Hicks*, 208 A.3d at 926). The Plurality further observed that the *Ortiz* Court rejected arguments substantially similar to those advanced by Philadelphia in this matter and concluded that, "notwithstanding any authority that the General Assembly has bestowed upon the cities to pass legislation, Section 6120(a) preempted the area of firearm regulation and barred the cities from enacting local firearm laws." *Id.* at 677-78. Finding that *Ortiz* was binding and that the same result must obtain here, the Plurality concluded that Philadelphia failed to plead a valid claim for interference with delegation.

## 2. Concurrence

Then-Judge Cohn Jubelirer penned a concurrence, opining that this Court's decision in *Ortiz* "left little air in [the] conclusion . . . that the regulation of firearms is to be done at the state, not local, level." *Id.* at 679 (Cohn Jubelirer, J., concurring). Judge Cohn Jubelirer nonetheless acknowledged the prevalence, severity, and tolls of gun violence in certain areas of the Commonwealth and expressed her receptiveness to the notion "that local conditions may well justify more severe restrictions than are necessary statewide." *Id.* (quoting *City of Phila. v. Armstrong*, 271 A.3d 555, 569 (Pa. Cmwlth. 2002)

(Leadbetter, S.J., concurring)). As such, Judge Cohn Jubelirer suggested that "[t]he novel constitutional arguments raised by [Appellants] may provide a basis for '[the Pennsylvania] Supreme Court to reconsider the breadth of the *Ortiz* doctrine[] and allow for local restrictions narrowly tailored to local necessities.'" *Id.* (third alteration in original) (quoting *Armstrong*, 271 A.3d at 569 (Leadbetter, J., concurring)).

### 3. Dissent

In dissent, Judge Ceisler concluded that Appellants had stated a legally sufficient claim with respect to all three counts of the Petition. As for Appellants' claim under the state-created danger doctrine, Judge Ceisler particularly faulted the Plurality for reading *Johnston* as imposing a blanket prohibition against applying the doctrine to nullify state laws and reasoned that *Johnston* was factually distinguishable from the instant matter. With respect to Appellants' substantive due process claim, Judge Ceisler highlighted that the General Assembly's preemption powers are not absolute and are subject to constitutional restrictions. Criticizing the Plurality's reliance on *Ortiz* to bar Appellants' claim, Judge Ceisler opined that *Ortiz* involved different legal questions and was decided over 25 years ago, further suggesting that this Court should revisit *Ortiz* given the increase in gun violence and its associated harms since that time.

Lastly, Judge Ceisler concluded that Philadelphia presented a viable claim that Section 6120(a) of the UFA improperly interferes with the public-health related duties expressly delegated to Philadelphia under the LHAL and DPCL. According to Judge Ceisler, the Petition sufficiently averred, *inter alia*, that gun violence is a menace to the public health of Philadelphia's residents and contributes to the spread of disease in Philadelphia. Noting that this Court "has recognized that the Commonwealth has a fundamental duty to 'maintain order and to preserve the safety and welfare of all citizens'" and opining that the Commonwealth expressly delegated a portion of this duty to

Philadelphia pursuant to the LHAL and the DPCL, Judge Ceisler observed that Philadelphia "aver[s] that by continuing to enforce and expand the [FPLs], [Appellees] have deprived [Philadelphia] of its ability to carry out these duties, because it cannot enact life-saving ordinances that would protect its residents from gun violence." *Id.* at 692 (Ceisler, J., dissenting) (quoting *Cnty. of Allegheny v. Commonwealth*, 490 A.2d 402, 410-11 (Pa. 1985)). Judge Ceisler also emphasized the nature of Philadelphia's claim, observing that Philadelphia "argues that it has been given the *responsibility*, but *not the authority*, to pass local regulations to address the public health crisis caused by gun violence" and that, "in this way, [Appellees] have interfered with its statutorily delegated duties." *Id.* at 693 (emphasis in original). Judge Ceisler further disagreed with the Plurality's conclusion that *Ortiz*'s holding necessarily foreclosed Philadelphia's delegation claim, as *Ortiz* did not address such a claim.

## II. ISSUES

Appellants appealed the Commonwealth Court's order to this Court, raising the following three issues:

1. Whether [Appellants] sufficiently alleged that [Appellees] violated the Pennsylvania Constitution's guarantee of all Pennsylvanians' right to "enjoy[] and defend[] life and liberty" in Article I, Section 1 by prohibiting the enactment of local firearm ordinances[.]

. . . .

2. Whether [Appellants] sufficiently alleged that [Appellees'] actions in preventing the enactment of local firearm ordinances that would save lives constitute a state-created danger in violation of Article I, Section 1 of the Pennsylvania Constitution[.]

. . . .

3. Whether [Philadelphia] sufficiently alleged that [Appellees] violated its fundamental responsibility to preserve the people's safety and welfare by (i) delegating to Philadelphia a statutory duty to address "menace[s] to public health" like gun violence, 16 P.S. § 12010(c); *see also* 35 P.S. §§ 521.1-521.21, while (ii) preventing Philadelphia from fulfilling that duty by enacting 18 Pa.[ ]C.S. § 6120[.]

(Appellants' Brief at 5-6.)

### III. ANALYSIS

In cases such as this one, where we are reviewing an order of the Commonwealth Court that sustained preliminary objections in the nature of a demurrer, our standard of review "is *de novo*, and our scope of review is plenary."[35] *Ladd v. Real Est. Comm'n*, 230 A.3d 1096, 1103 (Pa. 2020). A demurrer challenges the legal sufficiency of a pleading and "should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted." *Id.* (quoting *Yocum v. Pa. Gaming Control Bd.*, 161 A.3d 228, 234 (Pa. 2017)); *see also Leight*, 243 A.3d at 136 (explaining that, when considering propriety of order sustaining demurrer, "the question is whether, on the facts averred, there is no basis for recovery under the law"). In evaluating the legal sufficiency of the Petition, we must "accept as true all well-pleaded, material, and relevant facts alleged in the [Petition] and every inference that is fairly deducible from those facts." *Ladd*, 230 A.3d at 1103 (quoting *Mazur v. Trinity Area Sch. Dist.*, 961 A.2d 96, 101 (Pa. 2008)). This Court, however, "need not accept as true conclusions of law, unwarranted inferences, [argumentative] allegations, or expressions of opinion." *Crozer Chester Med. Ctr. v. Dep't of Lab. & Indus.*, 22 A.3d 189, 194 (Pa. 2011) (quoting *Bayada Nurses, Inc. v. Dep't of Lab. & Indus.*, 8 A.3d 866, 884 (Pa. 2010)); *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 26 (Pa. 2006) (quoting *Small v. Horn*, 722 A.2d 664, 668 (Pa. 1998)).

---

[35] Further, insofar as the issues raised implicate constitutional rights and statutory interpretation, such issues present questions of law for which our standard and scope of review is likewise *de novo* and plenary, respectively. *See Commonwealth v. Davis*, 220 A.3d 534, 540 (Pa. 2019) (providing that *de novo* standard of review and plenary scope of review apply to "issue involving a constitutional right"), *cert. denied sub nom. Pennsylvania v. Davis*, 141 S.Ct. 237 (2020); *Leight v. Univ. of Pittsburgh Physicians*, 243 A.3d 126, 136 (Pa. 2020) (providing that issue of statutory interpretation "is a pure question of law" for which "our standard of review is *de novo*, and our scope of review is plenary").

Moreover, "[a]ny doubts as to whether the demurrer should be sustained should be resolved in favor of reversing the order." *Leight*, 243 A.3d at 136.

## A. Substantive Due Process

Appellants first claim that they have sufficiently alleged that the FPLs deprive them of their right to enjoy and defend life and liberty under Article I, Section 1 of the Pennsylvania Constitution. Appellants assert that "the right to 'enjoy[] and defend[] life and liberty'" is a fundamental right and that encompassed within that right is "the right to protect *themselves* from gun violence by means of local regulation." (Appellants' Brief at 28-30 (quoting Pa. Const., art. I, § 1) (emphasis in original).) Appellants further claim that, as they adequately aver in their Petition, "regulations like a permit-to-purchase requirement, bulk-purchasing restrictions (*i.e.,* one-gun-per-month limits), and [ERPOs] would dramatically reduce the risks of gun violence in their communities." (*Id.* at 31.) Appellants submit that the FPLs have led to "the unnecessary death by gun violence of Black and Hispanic citizens, particularly young Black men in Pittsburgh and Philadelphia," and preclude Appellants from collectively enacting local measures to protect themselves from gun violence, thereby depriving Appellants of their substantive due process rights under Article I, Section 1. (*Id.* at 30-31.)

Appellants also claim that the FPLs are subject to strict-scrutiny review given that they infringe upon fundamental rights or, at the least, are subject to the intermediate scrutiny applicable to important rights, but they nonetheless fail to meet any level of judicial scrutiny applicable to determining whether the FPLs pass constitutional muster. Appellants submit that the Commonwealth Court Plurality erred by mischaracterizing their asserted constitutional right as the "right to have the government protect them from private acts of violence" and that precedent from the Commonwealth Court and this Court—particularly the opinions of the Commonwealth Court majority and then-Justice

Baer's concurrence in *Robinson Township v. Commonwealth*, 52 A.3d 463 (Pa. Cmwlth. 2012) (*Robinson Township I*), *aff'd in part, rev'd in part*, 83 A.3d 901 (Pa. 2013) (*Robinson Township II*) (collectively *Robinson Township*)—support recognition of their asserted "right to self-defense by legislation." (Appellants' Brief at 28-33.) Appellants further contend that the Plurality misapplied the preliminary objection standard relative to its treatment of the factual allegations in the Petition, erroneously determined that the FPLs were subject to rational-basis review, and failed to conduct its rational-basis review properly in concluding that the FPLs met that standard.

Appellees counter that Appellants have failed to sufficiently plead that the FPLs violate their substantive due process rights under Article I, Section 1 of the Pennsylvania Constitution. In support, Appellees submit that Article I, Section 1 protects citizens from state action, not each other's actions, and does not guarantee a minimal level of safety. Appellees add that Appellants assert a novel and legally unsupported proposition in claiming a collective right to "self-defense by local legislation" under Article I, Section 1. Appellees contend that Article I, Section 1 confers rights upon the people of this Commonwealth as individuals. Appellees submit that, as such, Article I, Section 1 does not encompass any "collective" right of Citizens, let alone a collective right to enact particular local legislation as a means of self-defense against private acts of violence, nor does it confer any rights upon Philadelphia or other municipal entities. Appellees contend that, having failed to identify a constitutionally protected right or interest under Article I, Section 1, Appellants' claim necessarily fails. Appellees further add that, at best, the FPLs are subject to rational-basis review and that the Commonwealth Court correctly determined that the FPLs pass constitutional muster under that standard.

We begin our analysis by reiterating the provisions of Article I, Section 1 of the Pennsylvania Constitution: "All men are born equally free and independent, and have

certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. "This section, like the due process clause in the Fourteenth Amendment of the United States Constitution, guarantees persons in this Commonwealth certain inalienable rights." *Nixon v. Commonwealth*, 839 A.2d 277, 286 (Pa. 2003). As we previously noted, the General Assembly may exercise its police power to "limit those rights by enacting laws to protect the public health, safety, and welfare," but "any such laws are subject to judicial review and a constitutional analysis." *Id.* In conducting our review of the constitutionality of a given statute, we are mindful "that a law is presumed to be constitutional and may only be found to be unconstitutional if the party challenging the law can prove that it 'clearly, palpably, and plainly' violates the Constitution." *Id.* Moreover, we "may not question the propriety of the public policies adopted by the General Assembly for the law," and we are instead "limited to examining the connection between those policies and the law." *Id.*

As noted, Appellants challenge the FPLs on substantive due process grounds. "Substantive due process is the 'esoteric concept interwoven within our judicial framework to guarantee fundamental fairness and substantial justice.'" *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004) (quoting *Commonwealth v. Stipetich*, 652 A.2d 1294, 1299 (Pa. 1995) (Cappy, J., dissenting)). As this Court explained in *Khan*, "for substantive due process rights to attach[,] there must first be the deprivation of a property right or other interest that is constitutionally protected." *Id.* That is, "[w]hen confronted with a constitutional challenge premised upon substantive due process grounds, the threshold inquiry is whether the challenged statute purports to restrict or regulate a constitutionally protected right." *Id.* at 947. If the statute restricts a fundamental right, then the statute is subject to strict-scrutiny review. *Germantown Cab Co. v. Phila.*

*Parking Auth.*, 206 A.3d 1030, 1042 (Pa. 2019). If the statute impacts a right that is protected but not fundamental, then we examine it under the rational-basis standard. *Id.*

Upon review, we conclude that Appellants have failed to identify a constitutionally protected right that the FPLs restrict or regulate. To begin, Appellants suggest that they have a right to "enjoy life and liberty" under Article I, Section 1, which Appellees are infringing through the FPLs by causing unnecessary death and injury by gun violence. We emphasize, however, that it is undisputedly private actors and not Appellees who are alleged to be directly committing the acts of gun violence at issue and that Appellants are purportedly not seeking recognition of a right to governmental protection against those private acts of gun violence. (*See* Appellants' Brief at 28 ("The [Commonwealth Court] Plurality Opinion sustained preliminary objections to Count II on the mistaken ground that [Appellants]' substantive due process claim was based on a "right to have the government protect them from private acts of violence. But Count II makes no such claim[.]" (citation omitted).) Insofar as Appellants' claim in this regard is one asserting that they have a constitutional right to be free of death and injury resulting from private gun violence that is created or increased by the state, we view such a claim to be indecipherable from their state-created danger claim, which we address and ultimately reject for reasons discussed below.

Appellants also assert that they have a collective "right to protect themselves from gun violence by means of local regulation" encompassed within the right to "defend[] life and liberty" under Article I, Section 1 of the Pennsylvania Constitution, which Appellees are infringing through the FPLs by preventing Appellants from exercising that right. (Appellants' Brief at 28-30 (emphasis omitted).) Generally speaking, the Declaration of Rights, of which Article I, Section 1 is a part, enshrines certain rights of the people of this Commonwealth *as individual citizens*. *See, e.g., League of Women Voters v.*

*Commonwealth*, 178 A.3d 737, 803 (Pa. 2018) (explaining that Pennsylvania Constitution's Declaration of Rights "is an enumeration of the fundamental individual human rights possessed by the people of this Commonwealth"); *Commonwealth v. Molina*, 104 A.3d 430, 442 (Pa. 2014) ("The structure of the Pennsylvania Constitution highlights the primacy of Pennsylvania's protection of individual rights: 'The very first Article of the Pennsylvania Constitution consists of the Pennsylvania Declaration of Rights, and the first section of that Article affirms, among other things, that all citizens "have certain inherent and indefeasible rights."'") (quoting *Pap's A.M. v. City of Erie*, 812 A.2d 591, 603 (Pa. 2002));[36] *In re: Fortieth Statewide Investigating Grand Jury*, 190 A.3d 560, 578 (Pa. 2018) ("Under the Declaration of Rights set forth in the Pennsylvania Constitution, individuals enjoy the fundamental right to the protection of their reputations."); *Germantown Cab Co.*, 206 A.3d at 1043 (Pa. 2019) ("Pursuant to Article I, Section 1, protected interests include the right of an individual to pursue his or her livelihood or profession.").

Moreover, these rights "are specifically exempted from the powers of Commonwealth government to diminish." *League of Women Voters*, 178 A.3d at 803; *see also* Pa. Const. art. I, § 25 ("To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate."). The Declaration of Rights does not confer power upon the government, nor does it afford protection to governmental entities. *See Wolf v. Scarnati*, 233 A.3d 679, 701 (Pa. 2020) ("The Declaration of Rights[] . . . serves to protect individuals from an overbearing government in general, not to empower any department of that government."), *superseded by constitutional*

---

[36] While *Molina* is designated as an Opinion Announcing the Judgment of the Court, three out of the five participating Justices were in alignment with respect to the above proposition.

*amendment on other grounds as stated in Corman v. Acting Sec'y of Pa. Dep't of Health*, 266 A.3d 452, 457 (Pa. 2021); *Off. of Atty. Gen. ex rel. Corbett v. E. Brunswick Twp.*, 956 A.2d 1100, 1108 (Pa. Cmwlth. 2008) (explaining that "Article 1 of the Pennsylvania Constitution sets forth a Declaration of the Rights of individual citizens, not the rights of municipal corporations" and "does not recognize or protect the rights of local governments from encroachment by state government").

Here, Appellants seek an interpretation of Article I, Section 1 of the Pennsylvania Constitution that would designate the individual right to "defend life and liberty" not just as a collective right but as a collective right to self-defense from private acts of gun violence, specifically by means of local legislation. Simply put, Appellants provide no basis upon which to conclude that the right to "defend life and liberty" set forth in Article I, Section 1 is so broad as to encompass such a right. Instead, Appellants rely upon general constitutional principles and paint their argument with overly broad strokes, using an amalgamation of pronouncements and concepts gleaned from inapt case law and secondary sources to support their position. For instance, Appellants claim that "Article I, Section 1 was 'established for the protection of personal safety and private property;'" that "[i]ts protections include the right to 'enjoy[] and defend[] life and liberty'" and attendant substantive due process rights "to guarantee fundamental fairness and substantial justice;" and that our Constitution can and does provide protections beyond its federal counterpart. (Appellants' Brief at 29 & n.15 (quoting *Appeal of Ervine*, 16 Pa. 256, 263 (Pa. 1851); *Khan*, 842 A.2d at 946).)

It is beyond peradventure that our Constitution guarantees the right to "defend[] life and liberty," as its text plainly reveals. Pa. Const. art. I, § 1. We similarly do not disagree that Article I, Section 1 protects "*personal* safety and private property" as stated in *Appeal of Ervine*, 16 Pa. at 263 (emphasis added), or that our precedent recognizes

Article I, Section 1 as a home for substantive due process protections, *Khan*, 842 A.2d at 946; *Germantown Cab Co.*, 206 A.3d at 1042 ("Due process protections . . . emanate from the Pennsylvania Constitution, particularly Article I, Sections 1, 9, and 11."). Continuing in this vein, it is likewise uncontroversial to say, as a general matter, that this Court has an "inherent authority to recognize rights under our state constitution more expansive than those perceived by our federal counterpart" and "that we have not 'hesitated to interpret the Pennsylvania Constitution as affording greater protections' to individuals." *Commonwealth v. Shabezz*, 166 A.3d 278, 286 (Pa. 2017) (quoting *Commonwealth v. Sell*, 470 A.2d 457, 467 (Pa. 1983)). These general propositions, however, are wholly insufficient to establish that our Constitution guarantees a collective right to self-defense from private acts of gun violence through local legislation.

Appellants also argue that "the right to defend oneself under Article I, Section 1 is 'broader than, and not dependent on, a right to bear arms,'" as recognized by the Commonwealth Court in its unpublished decision in *Madziva v. Philadelphia Housing Authority* (Pa. Cmwlth., No. 1215 C.D. 2013, filed May 12, 2014) (Appellant's Br. at 29 n.15). Notwithstanding any receptiveness that this Court may have to the notion that the right to self-defense as provided in Article I, Section 1 extends beyond the right to bear arms, we observe that *Madziva* concerned the exercise of self-defense through use of physical force by the Philadelphia Housing Authority (PHA) during an altercation with a PHA tenant. Like the generalized propositions relied upon by Appellants above, *Madziva* simply does not support the proposition that Article I, Section 1 confers a constitutionally protected collective right to self-defense by local legislation.

Appellants further submit that "'liberty' has long been understood to extend to 'an effectual share in the making and administration of the laws' as 'the best apparatus to secure th[e] protection' of other rights and interests, including specifically 'local and

institutional self-government,' which 'arises out of a willingness of the people to attend to their own affairs.'"  (Appellants' Brief at 29-30 (quoting John Bouvier, Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union (14th ed., Philadelphia, George W. Childs 1871)).) Appellants add that, "[b]efore the enactment of the FPLs, one crucial way Pennsylvanians ensured their 'enjoy[ment] and defen[se of] life and liberty' was by adopting local firearm regulations, tailored to prevent or reduce gun violence in their specific communities." (Appellants' Brief at 27 (pointing to Philadelphia's long history of local firearm regulation and *Lehman v. Pennsylvania State Police*, 839 A.2d 265, 273 (Pa. 2003) (recognizing that "[t]he right to bear arms, although a constitutional right, is not unlimited and may be restricted in the exercise of the police power for the good order of society and protection of the citizens")).)  This argument suffers from deficiencies similar to all of Appellants' aforementioned arguments.  At best, this historical perspective simply demonstrates that, prior to the enactment of the FPLs, Pennsylvania citizens participated in the democratic process, which happened to result in the passage of certain local firearms regulations. While that may be true, such circumstances fall woefully short of demonstrating that Article I, Section 1 itself encompasses a collective right to self-defense through, or liberty interest in, particular local gun safety regulation.

Finally, Appellants rely heavily upon the Commonwealth Court's majority opinion and then-Justice Baer's concurring opinion in *Robinson Township I and II*, respectively, to support their position in this regard.  As Appellees correctly point out, those opinions are not binding on this Court.  Moreover, those opinions do not recognize a right to self-defense by local legislation encompassed within Article I, Section 1.  In *Robinson Township*, the petitioners challenged the General Assembly's amendment of the act

commonly referred to as the Oil and Gas Act (Act 13),[37] which, *inter alia*, preempted municipalities' ability to regulate oil and gas extraction operations through local zoning ordinances and required that municipalities amend their zoning ordinances to permit oil and gas operations in all zoning districts. While it is true that the Commonwealth Court majority and Justice Baer concluded that Act 13 was unconstitutional as violative of substantive due process,[38] their conclusions in this regard rested upon a different textual basis—*i.e.*, the right to one's quiet enjoyment of his or her property under Article I, Section 1—as well as their application of precepts and analysis unique to land use and zoning that pertain specifically to that right. *See Robinson Twp. I*, 52 A.3d at 485 ("Because [Act 13] requires all oil and gas operations in all zoning districts, including residential districts, as a matter of law, we hold that [Act 13] violates substantive due process because it allows incompatible uses in zoning districts and does not protect the interests of neighboring property owners from harm, alters the character of the neighborhood, and makes irrational classifications."); *Robinson Twp. II*, 83 A.3d at 1001, 1005 (Baer, J., concurring) (concluding that, through Act 13, "General Assembly has unconstitutionally, as a matter of substantive due process, usurped local municipalities' duty to impose and enforce community planning, and the concomitant reliance by property owners, citizens, and the like on that community planning," and "mandat[ed] that municipalities pass land-use and zoning ordinances, which permit landowners, statewide, to violate *sic utere tuo ut alienum non laedas*"). We do not read these nonbinding opinions as supporting the broad proposition that Article I, Section 1

---

[37] 58 Pa. C.S. §§ 2301-3504.

[38] This Court's plurality Opinion in *Robinson Township II* concluded that provisions of Act 13 were unconstitutional on the ground that they violated the Environmental Rights Amendment, Pa. Const. art. I, § 27. *Robinson Twp. II*, 83 A.3d at 913, 985 (plurality). In doing so, it did not reach the other constitutional issues raised by the parties.

confers upon Appellants a constitutionally protected "collective right to self-defense by means of local regulation."

In sum, despite Appellants' efforts to shine a light on a purported "collective right to self-defense by local regulation" housed in Article I, Section 1 of the Pennsylvania Constitution, their mere incantations of generalized constitutional principles and the like simply fail to provide a sufficient basis for us to conclude that such a right exists.[39]  As Appellants have not identified a right protected under Article I, Section 1 that Appellees have infringed so as to implicate substantive due process,[40] their first cause of action necessarily fails as a matter of law.

## B.  State-Created Danger Doctrine

Appellants assert that they have stated a claim under the state-created danger doctrine.  Appellants first note that, while this Court has yet to recognize the state-created danger doctrine as applicable under Article I, Section 1 of the Pennsylvania Constitution, the doctrine is equally applicable thereunder given the well-settled precept "that due process guarantees under the state constitution are 'identical to those which extend to interests protected by the Due Process Clause of the Fourteenth Amendment.'" (Appellants' Brief at 41 (quoting *R. v. Dep't of Pub. Welfare*, 636 A.2d 142, 153 (Pa. 1994)).)  Appellants further argue that the Commonwealth Court Plurality erred in rejecting their claim on the grounds that the state-created danger doctrine does not apply to invalidate legislation and that, even if the doctrine did apply, Appellants failed to adequately plead its elements.

---

[39] In addition, we note that any purported constitutional right to enact local legislation on any particular subject is in tension with the General Assembly's superior authority over municipalities in this realm, which we discuss in detail above.  Appellants do not directly address this tension in their advocacy, providing an additional reason why we are reluctant to recognize such a right.

[40] We also observe that Appellants do not develop a discrete argument that CeaseFirePA and Philadelphia have constitutionally protected rights under Article I, Section 1.

Appellees counter that Appellants failed to adequately plead a claim for relief under the state-created danger doctrine. Noting that neither the Supreme Court of the United States nor this Court has endorsed the state-created danger doctrine, Appellees also echo the Commonwealth Court Plurality's conclusion that the doctrine has not been, and cannot be, invoked to render a statute unconstitutional. Appellees submit that Appellants' attempt to invalidate the FPLs with the doctrine is misplaced and inconsistent with case law in the area, falling well outside the doctrine's paradigm. Appellees add that, even if the doctrine could apply to invalidate a statute as unconstitutional, Appellants have failed to sufficiently plead any of the elements required to establish that the FPLs are invalid under the doctrine.

We begin by observing that the Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Moreover, it is well settled that, under federal due process principles, a state has no affirmative obligation to protect its citizens from private acts of violence. As the United States Supreme Court has explained:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression[.]" Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.
>
> Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or

property interests of which the government itself may not deprive the individual. As [stated] in *Harris v. McRae*[, 448 U.S. 297, 317-18 (1980)]: "Although the liberty protected by the Due Process Clause affords protection against unwarranted *government* interference . . . , it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*DeShaney*, 489 U.S. at 195-97 (emphasis in original) (some citations omitted) (footnote omitted); *see also R.W. v. Manzek*, 888 A.2d 740, 743 & n.6 (Pa. 2005) (citing *DeShaney* and observing "general rule that the state has no affirmative obligation to protect its citizens from the violent acts of private individuals").

As explained by the Commonwealth Court Plurality, the "state-created danger doctrine" is recognized in many jurisdictions as an exception to *DeShaney*'s general rule. To be sure, Appellees' position is well-taken insofar as they submit that: (1) the Supreme Court of the United States has never confirmed the doctrine's viability, nor has this Court ever accepted the doctrine under Article I, Section 1 of the Pennsylvania Constitution; and (2) the doctrine has never been used to invalidate a statute. We need not decide, however, whether these points foreclose Appellants' claim because we conclude that, even assuming *arguendo* the doctrine's viability and applicability here, Appellants cannot establish the required elements to prevail on the claim. These elements include:

1) the harm ultimately caused was foreseeable and fairly direct;

2) a state actor acted with a degree of culpability that shocks the conscience;

3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013) (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)).[41]

Appellants have failed to satisfy the first prong of the state-created danger doctrine.[42] As noted, that prong concerns whether the "harm ultimately caused" to Appellants was "foreseeable and fairly direct." *Id.* In this regard, we note that the doctrine applies only when the state creates or enhances a danger that results in a third-party harming a plaintiff, thus, in theory, depriving the plaintiff of his due process rights to life, liberty, or property. *See, e.g.*, *Rivera v. Rhode Island*, 402 F.3d 27, 37-38 (1st Cir. 2005) ("[M]erely rendering a person more vulnerable to risk does not create a constitutional duty to protect. In part this is because an increased risk is not itself a deprivation of life, liberty, or property; it must still cause such a deprivation." (citation omitted)); *Doe #1 v. Del. Valley Sch. Dist.*, 572 F. Supp. 3d 38, 74-75 (M.D. Pa. 2021) (concluding that alleged harms of "exposure to present and existential threats to health and safety, threat of retribution and bullying, [and] increased risk of serious bodily injury and/or death . . . consist only of future potential or threatened harms, and are thus insufficient to meet the first prong of the state-created danger" doctrine) (internal quotation marks omitted) (relying upon

---

[41] As for the elements of the state-created danger doctrine, we observe that there are discrepancies among jurisdictions that have adopted it. *See Fisher v. Moore*, 73 F.4th 367, 372, 374 n.32 (5th Cir. 2023) (explaining that Fifth Circuit has never adopted state-created danger doctrine and noting that, *inter alia*, there is "variation among [the] circuits in articulating and applying this somewhat nebulous doctrine," Third Circuit outlines four elements while Tenth Circuit sets forth six elements, and some circuits require a "shocks the conscience" element while others do not). Notwithstanding, the Commonwealth Court Plurality and Appellants rely upon the four-pronged test as set forth above in *Morrow* to present their analyses and arguments. As such, we assume the above articulation of the doctrine for purposes of discussion, without deciding that we would adopt it.

[42] For this reason, we need not address the remaining prongs of the doctrine.

*Customers Bank v. Mun. of Norristown*, 563 Fed. Appx. 201, 205 (3d Cir. 2014) (explaining that first element of state-created danger doctrine "focuses on the 'harm ultimately caused,' not harms that are potential or threatened")). As these cases demonstrate, it is not enough, for purposes of establishing the doctrine's first element, to allege harm in the form of an exposure to or increase in threatened or potential harm alone. Accordingly, insofar as Appellants' allegations suggest that the harm they have suffered consists of the mere exposure to the threat or increased risk of gun violence and its attendant impacts that would not exist but for the FPLs, Appellants have failed to allege the requisite harm to satisfy the doctrine's first element.

Additionally, to the extent that Appellants assert in the Petition that they have suffered harm resulting from discrete incidents of private gun violence, Appellants' averments, as a matter of law, fall short of satisfying the first element of the state-created danger doctrine because they do not allege that these incidents were a "fairly direct" result of Appellees' legislative actions relative to the FPLs for purposes of the doctrine. On this point, we find the Third Circuit's decision in *Henry* instructive.

> To fulfill the "fairly direct" requirement of the state-created danger claim, the plaintiff must plausibly allege that state officials' actions "precipitated or w[ere] the catalyst for" the harm for which the plaintiff brings suit. "Precipitate," in turn, means "to cause to happen or come to a crisis suddenly, unexpectedly, or too soon." Thus, it is insufficient to plead that state officials' actions took place somewhere along the causal chain that ultimately led to the plaintiff's harm."

*Henry*, 728 F.3d at 285 (alteration in original) (citations omitted).[43] The Third Circuit added that a defendant's actions cannot be "separated from the ultimate harm by a

---

[43] Pertinently, the *Henry* court also observed:

> State actors are not liable every time their actions set into motion a chain of events that result in harm. The Supreme Court [of the United States] has explained, for instance, that

(continued…)

lengthy period of time and intervening forces and actions." *Id.* (concluding further that plaintiffs in *Henry* had "not plausibly alleged that defendants' actions were close in time and succession to the ultimate harm" where state "defendants' approval and subsidization of [an] apartment did not lead 'fairly directly' to [a] fire that claimed the lives of" apartment's tenant and guest).

Moreover, the Third Circuit in *Henry* relied upon, *inter alia*, its prior decision in *Morse* to render its analysis. In *Morse*, a mentally ill individual shot and killed a teacher after entering a school through a back entrance that school officials had left unlocked for purposes of providing contractors an easy mode of ingress and egress. In rejecting the plaintiff's state-created danger claim, the *Morse* court concluded that the "attack was not a 'fairly direct' result of defendants' actions" and explained:

> We recognize that plaintiff has alleged that the harm which befell [the teacher] was "a direct result of defendants' acts." But we are not bound to accept a conclusory statement, and as a matter of law this cannot be true. [The p]laintiff's allegation that, as a result of defendants' decision to allow construction workers to have access to the school through an unlocked rear entrance, [the attacker] was able to enter the building and murder [the teacher] is insufficient to support liability. While we must accept the allegation that [the attacker] gained access to the building through the unlocked rear entrance, this does not mean the attack on [the teacher] occurred as a direct result of defendants allowing the construction crews to prop open the door. The causation, if any, is too attenuated. [The p]laintiff can prove no set of facts which will provide the direct causal connection between [the] deadly attack and any of defendants' allegedly improper acts.
>
> . . . .
>
> . . . Here, it was not defendants' decision to allow the rear entrance to the school to remain open that precipitated or was the catalyst for the

> [a] legislative decision that has an incremental impact on the probability that death will result in any given situation—such as setting the speed limit at 55-miles-per-hour instead of 45—cannot be characterized as state action depriving a person of life just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander.

*Henry*, 728 F.3d at 283 (quoting *Martinez v. State of California*, 444 U.S. 277, 281 (1980)).

attack on [the teacher]. . . . [The defendants' actions,] as a matter of law, [cannot] be said to have directly caused the attack.

*Morse*, 132 F.3d at 908-10.

Returning to the Petition, Appellants fail to allege that the harm they have suffered by virtue of the discrete acts of gun violence described therein—*e.g.*, the loss of their loved ones and associated trauma—were a "fairly direct" result of Appellees' legislative actions relative to the FPLs. That is, Appellants have failed to aver sufficiently that Appellees' actions "precipitated or [were] the catalyst" for the private acts of gun violence. *Id.* at 910. As a matter of law, then, Appellees cannot "be said to have directly caused the attack[s]" and associated harm. *Id.*; *see also Crawford*, 277 A.3d at 671 (plurality) (explaining that "role that the UFA played in overall scenarios," *i.e.*, "the incidents of gun violence listed and described in the [Petition]," were "entirely imaginative and speculative, because there are multiple, indeed countless, variables that account for—or contributed toward—the actual incidents of violence in the unique circumstances of each case, including the identity and background of the perpetrator and things such as motive or intent").[44]

For the reasons stated, we hold that the Commonwealth Court Plurality correctly concluded that Appellants failed to state a claim for which relief can be granted under the state-created danger doctrine.

## C. Interference with Delegation

Finally, Appellants argue that Philadelphia has sufficiently alleged that Section 6120 of the UFA impermissibly interferes with its delegated responsibilities under the LHAL and DPCL. Appellants first contend that the Commonwealth Court Plurality

---

[44] Finally, insofar as Appellants argue that the harm that they suffered is a deprivation of their purported constitutional right to defend themselves through local legislation, we reiterate that Appellants have failed to establish that they have such a right in the first instance.

erred in dismissing the delegation claim on the ground that the term "public health" does not encompass the epidemic of gun violence and its attendant impacts. Appellants submit that the Commonwealth's delegation of public health responsibility under those statutory frameworks includes the duty to address gun violence under a commonsense meaning of the term "public health." In support, Appellants highlight that "[t]he use of firearms causes death, injury, and disability" and that various entities from the medical field and government, as well as other courts, have recognized gun violence as a public health issue and firearms regulations as public health measures. (Appellants' Brief at 57-59.) Appellants submit that the Plurality ignored the common, widespread usage of the term "public health" in favor of "selective dictionary definitions of the term," thereby construing the term too narrowly and in contravention of the term's common and approved usage. (Appellants' Brief at 60.) Appellants also fault the Plurality for "baldly stating that firearms do not affect people in the 'medical sense'" and argue that its reasoning is untenable, as "a gun regulation aiming to reduce injuries and deaths caused by firearms is a 'method of maintaining the health of the community.'" (*Id.* (quoting *Crawford*, 277 A.3d at 677 (plurality)).)

Appellants add that, having delegated the responsibility of addressing gun violence, the Commonwealth cannot prevent municipalities from carrying out that responsibility. Appellants assert that their claim is viable under *Allegheny County v. Commonwealth*, 490 A.2d 402 (Pa. 1985), and *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 681 A.2d 1366 (Pa. Cmwlth. 1996), which, according to Appellants, "establish that the Commonwealth impermissibly interferes with delegated responsibilities when it (1) is under a constitutionally imposed obligation, (2) has delegated some responsibility for carrying out that obligation to a local government, and (3) fails to provide that local government with adequate powers or

resources to carry out the delegated responsibility." (Appellants' Brief at 60-62.) Appellants submit that these elements are met here and that the Commonwealth Court Plurality erred by misinterpreting *Ortiz* as concluding that it requires dismissal of their delegation claim.

Appellees counter that Appellants have failed to sufficiently allege that the FPLs interfere with powers delegated to Philadelphia under the LHAL and DPCL. Appellees contend that Appellants' proffered interpretations of the LHAL and DPCL as encompassing gun regulation ignore and conflict with, or are otherwise overly broad and unsupported by, the plain language of those statutes. Appellees claim that the LHAL and DPCL clearly delegate duties to local entities relative to preventing and controlling illnesses and diseases, not controlling gun violence or, more critically, regulating firearms. Appellees add that Appellants' claim fails because the provisions of the LHAL and DPCL must give way to the FPLs, particularly given that they are more specific and were enacted later in time. Appellees argue that, as Philadelphia has no delegated authority to regulate firearms under the LHAL and DPCL, Appellants' claim that the FPLs interfere with that non-existent authority fails.

Appellants' final issue requires us to engage in statutory interpretation. As such, the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. §§ 1501-1991, guides our analysis. The Statutory Construction Act provides that the object of all statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). Generally, the plain language of the statute "provides the best indication of legislative intent." *Miller v. Cnty. of Centre*, 173 A.3d 1162, 1168 (Pa. 2017). When the statutory language is ambiguous, however, we may ascertain the General Assembly's intent by considering the factors set forth in Section 1921(c) of the Statutory Construction Act, 1 Pa. C.S. § 1921(c), and other rules of statutory

construction. *See Pa. Sch. Bds. Ass'n, Inc. v. Pub. Sch. Emps. Ret. Bd.*, 863 A.2d 432, 436 (Pa. 2004) (observing that "other interpretive rules of statutory construction are to be utilized only where the statute at issue is ambiguous").

Additionally, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," though "technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in [the Statutory Construction Act] shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa. C.S. § 1903(a). "We also presume that 'the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable,' and that 'the General Assembly intends the entire statute to be effective and certain.'" *Berner v. Montour Twp. Zoning Hearing Bd.*, 217 A.3d 238, 245 (Pa. 2019) (quoting 1 Pa. C.S. § 1922(1)-(2)). Finally, we observe:

> Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

1 Pa. C.S. § 1933.

Turning to the statutory language at issue, Appellants rely upon Sections 2(a) and 10(c) of the LHAL and Section 3(a) of the DPCL in support of their position. Section 2(a) of the LHAL provides:

> The General Assembly of this Commonwealth has determined and hereby declares as a matter of legislative finding that:
>
> > (a) The protection and promotion of the health of the people in the furtherance of human well-being, industrial and agricultural productivity and the national security is one of the highest duties of the Commonwealth.

16 P.S. § 12002(a). Section 10(c) of the LHAL provides that county departments of health "shall prevent or remove conditions which constitute a menace to public health." 16 P.S.

§ 12010(c). Section 3(a) of the DPCL provides that "[l]ocal boards and departments of health shall be primarily responsible for the prevention and control of communicable and non-communicable disease, including disease control in public and private schools, in accordance with the regulations of the [State Advisory Health Board] and subject to the supervision and guidance of the [State Department of Health]." 35 P.S. § 521.3(a). Again, Section 6120(a) of the UFA provides:

> (a) General rule.--No county, municipality or township may in any manner regulate the lawful ownership, possession, transfer or transportation of firearms, ammunition or ammunition components when carried or transported for purposes not prohibited by the laws of this Commonwealth.

18 Pa. C.S. § 6120(a).

Given the statutory language at issue, we begin by emphasizing the precise nature of Appellants' so-called "interference with delegation" claim. Appellants allege that Section 6120 of the UFA—a state-wide statute enacted by the General Assembly—improperly interferes with the responsibilities delegated to Philadelphia under the LHAL and DPCL—two other state-wide statutes enacted by the General Assembly. For Appellants' claim to succeed, however, we would have to conclude, as a matter of statutory interpretation, that: (1) the above provisions of the LHAL and DPCL are sufficiently broad to provide local governments with not only the authority to address "gun violence" generally, but also the authority to "regulate firearms" specifically; and (2) as a result, Section 6120(a) improperly interferes with—*i.e.*, conflicts with—those provisions by virtue of its prohibition against local firearm regulation. We reject this interpretation of the various statutes.

By delegating to local entities the responsibilities: (1) to protect and promote the health of their citizens; (2) to prevent or remove conditions constituting a menace to public health; and (3) to prevent and control communicable and non-communicable diseases, the General Assembly clearly did not explicitly task local governments with the specific

responsibilities of regulating the lawful ownership, possession, transfer, and transportation of, *inter alia*, firearms under the plain language of the LHAL and DPCL. Moreover, even to the extent that it can be argued that the plain language of those statutes leaves room to question whether the General Assembly implicitly authorized local governments to regulate in these areas, the General Assembly answered that query in the negative by enacting Section 6120(a) of the UFA. Indeed, Appellants' position that the grant of authority provided to local entities via the LHAL and DPCL includes the regulation of firearms—and particularly in a way with which Section 6120(a) would "interfere" or "conflict"—calls for an interpretation of the LHAL and DPCL that plainly contravenes statutory construction principles. *See E.D.B. ex rel. D.B. v. Clair*, 987 A.2d 681, 684 (Pa. 2009) ("If possible, we must avoid a reading that would lead to a conflict between different statutes or between individual parts of a single statute."); *Hous. Auth. of Cnty. of Chester v. Pa. State Civ. Serv. Comm'n*, 730 A.2d 935, 946 (Pa. 1999) ("A conflict between various statutes or parts thereof is to be avoided and, if possible, the apparently conflicting provisions must be construed together with the more specific provisions prevailing over the general ones."); *see also* 1 Pa. C.S. § 1933, *supra*.[45] We will not read a conflict into the statutory language at issue that simply is not there.[46]

---

[45] We similarly reject any suggestion that the General Assembly delegated the "responsibility"—not the "authority"—to address gun violence to Philadelphia under the LHAL and DPCL without providing Philadelphia with the "power" or "resources" to effectuate that responsibility by virtue of Section 6120 of the UFA. Assuming that there is a meaningful difference between the General Assembly's delegation of "authority," "responsibility," "power," and "resources" in this context, our analysis remains unchanged. Moreover, interpreting the above provisions to conclude that the General Assembly intended to delegate a responsibility to Philadelphia while withholding the power to effectuate that responsibility is unreasonable and absurd. *See* 1 Pa. C.S. § 1922(1) (providing "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable").

[46] Assuming *arguendo* that the provisions of Section 6120 of the UFA that concern local firearm regulation irreconcilably conflict with the public health and disease prevention (continued…)

As such, Appellants have failed to demonstrate that the General Assembly intended to delegate to local entities any authority to regulate firearms under the LHAL and DPCL with which Section 6120 of the UFA can interfere. Appellants' "interference with delegation" claim, thus, fails as a matter of law.

## IV. CONCLUSION

The accounts of gun violence set forth in the Petition, like all other instances of gun violence, are undeniably tragic. There is also no doubt that a serious problem exists in this Commonwealth relative to gun violence and its impacts on our citizenry. While certain municipalities and residents thereof may believe, even justifiably, that our state government is not doing enough to remedy this problem and that particular local regulations are needed to do so but are preempted by the FPLs, we emphasize that "the adequacy of the legislation to cope with the problem and the wisdom or the lack thereof on the part of the legislature in framing [the] legislation is not for us to determine. Such questions are solely for the legislature to determine and upon their province we must not encroach." *Harris-Walsh, Inc. v. Borough of Dickson City*, 216 A.2d 329, 336 (Pa. 1966). Stated another way, there is nothing for us to do in the absence of a constitutional violation or other infirmity in the FPLs. *See Thornburgh v. Lewis*, 470 A.2d 952, 955 (Pa. 1983) (providing that judiciary is tasked with determining "whether the Constitution or laws of the Commonwealth require or prohibit the performance of certain acts"). For the reasons stated, however, Appellants have failed to state a legally cognizable claim that the FPLs are unconstitutional or otherwise infirm on the asserted grounds that: (1) the FPLs violate

---

provisions of the LHAL and DPCL, we agree with Appellees that the provisions of Section 6120 would be construed as an exception thereto on the grounds that they are more specific and were enacted later in time. The General Assembly enacted the provisions of the LHAL and DPCL at issue in the 1950s, while the General Assembly enacted Section 6120 of the UFA in 1974. *Compare* 16 P.S. § 12010 (enacted in 1951), *and* 35 P.S. § 521.3 (enacted in 1956), *with* 18 Pa. C.S. § 6120 (enacted in 1974).

substantive due process; (2) the FPLs violate the state-created danger doctrine; and (3) the FPLs interfere with Philadelphia's delegated duties under the LHAL and DPCL.[47] Accordingly, we affirm the order of the Commonwealth Court dismissing the Petition with prejudice.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht and Mundy join the opinion.

---

[47] The parties and their *amici* present various arguments relating to, *inter alia*, the type and scope of the FPLs' preemption and the soundness and reach of our prior decision in *Ortiz* (particularly as these questions relate to the viability of the claims presented herein), as well as alternative grounds upon which to rule on Appellants' claims. Given that our disposition of this appeal does not require us to reach such issues, we decline to address them today.